15-2124-cv(L)
Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: May 12, 2016    Decided: January 17, 2017)

Docket No. 15-2124-cv(L), 15-2141-cv(CON)

_____

MARBLEGATE ASSET MANAGEMENT, LLC, MARBLEGATE SPECIAL
OPPORTUNITIES MASTER FUND, L.P.,

*Plaintiffs–Counter-Defendants–Appellees*,

v.

EDUCATION MANAGEMENT FINANCE CORP., EDUCATION
MANAGEMENT, LLC,

*Defendants–Appellants*,

EDUCATION MANAGEMENT CORPORATION,

*Defendant–Counter-Claimant–Appellant*,

STEERING COMMITTEE FOR THE AD HOC COMMITTEE OF
TERM LOAN LENDERS OF EDUCATION MANAGEMENT, LLC,

*Intervenor–Appellant*.

_____

Before:

CABRANES, STRAUB, and LOHIER, *Circuit Judges*.

Defendant-appellant Education Management Corporation ("EDMC") and its subsidiaries appeal from a judgment following a bench trial before the United States District Court for the Southern District of New York (Failla, J.). The District Court held that a series of transactions meant to restructure EDMC's debt over the objections of certain noteholders violated Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b). The transactions at issue, the District Court determined, stripped the non-consenting noteholders, plaintiffs-appellees Marblegate Asset Management, LLC and Marblegate Special Opportunity Master Fund, L.P. (together, "Marblegate"), of their practical ability to collect payment on notes purchased from EDMC's subsidiaries. As a result, the District Court ordered EDMC to continue to guarantee Marblegate's notes and pay them in full. On appeal, EDMC argues that it complied with Section 316(b) because the transactions did not formally amend the payment terms of the indenture that governed the notes. We agree with EDMC and conclude that Section 316(b) prohibits only non-consensual amendments to an indenture's core payment terms. We therefore **VACATE** the judgment and **REMAND** to the District Court for further proceedings consistent with this opinion.

Judge STRAUB dissents by separate opinion.

SEAN E. O'DONNELL (Christopher W. Carty, Lucy C. Malcolm, Stewart R. Gilson, Pratik A. Shah, Hyland Hunt, *on the brief*), Akin Gump Strauss Hauer & Feld LLP, New York, NY, *for Plaintiffs–Counter-Defendants–Appellees*.

EMIL A. KLEINHAUS (Alexander B. Lees, *on the brief*), Wachtell, Lipton, Rosen & Katz, New York, NY, *for Defendants–Appellants* and *Defendant–Counter-Claimant–Appellant*.

ANTONIA M. APPS (Aaron L. Renenger, *on the brief*), Milbank, Tweed, Hadley & McCloy LLP, New York, NY, *for Intervenor–Appellant*.

LOHIER, *Circuit Judge*:

Defendant-appellant Education Management Corporation ("EDMC") and its subsidiaries appeal from a judgment following a bench trial before the United States District Court for the Southern District of New York (Failla, J.). The District Court held that a series of transactions meant to restructure EDMC's debt over the objections of certain noteholders violated Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b). The transactions at issue, the District Court determined, stripped the non-consenting noteholders, plaintiffs-appellees Marblegate Asset Management, LLC and Marblegate Special Opportunity Master Fund, L.P. (together, "Marblegate"), of their practical ability to collect payment on notes purchased from EDMC's subsidiaries. As a result, the District Court ordered EDMC to continue to guarantee Marblegate's notes and pay them in full.

On appeal, EDMC argues that it complied with Section 316(b) because the transactions did not formally amend the payment terms of the indenture that governed the notes. We agree with EDMC and conclude that Section

3

316(b) prohibits only non-consensual amendments to an indenture's core payment terms. We therefore **VACATE** the judgment and **REMAND** to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

1. Facts

EDMC is a for-profit higher education company that relies heavily on federal funding through Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070–1099. EDMC is the parent company of defendants-appellants Education Management, LLC and Education Management Finance Corporation (together, the "EDM Issuer").

In 2014 EDMC found itself in severe financial distress. Its enterprise value had fallen well below its $1.5 billion in outstanding debt. But restructuring its debt by resorting to bankruptcy court was not a realistic option for EDMC, which, the parties agree, would lose its eligibility for Title IV funds if it filed for bankruptcy and discontinued as an ongoing concern. See 20 U.S.C. § 1002(a)(4)(A).[1] EDMC therefore had to cooperate with its

---

[1] Section 1002(a)(4)(A) states, in relevant part: "An institution shall not be considered to meet the definition of an institution of higher education in paragraph (1) if—(A) the

creditors outside of the bankruptcy process if it hoped to restructure its debt and persist as a viable entity.

EDMC's outstanding debt consisted of both secured debt (roughly $1.3 billion) and unsecured debt ($217 million). The secured debt was governed by a 2010 credit agreement between the EDM Issuer and secured creditors (the "2010 Credit Agreement"). The 2010 Credit Agreement gave EDMC's secured creditors the right, upon default, to deal with the collateral securing the loans "fully and completely" as the "absolute owner" for "all purposes." The collateral securing the debt consisted of virtually all of EDMC's assets.

The unsecured debt, to which we will refer as the "Notes," was also issued by the EDM Issuer and governed by an indenture executed in March 2013 and qualified under the Trust Indenture Act of 1939 (the "Indenture"). The Notes were guaranteed by EDMC as the parent company of the EDM Issuer (we refer to this guarantee as the "Notes Parent Guarantee") and carried a high effective interest rate—nearly 20 percent per year—to compensate for the riskier nature of the unsecured debt. Both the Indenture

institution, or an affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management or policies of the institution, has filed for bankruptcy . . . ." Id.

and the offering circular relating to the Notes informed lenders who had purchased them (the "Noteholders") about their rights and obligations as junior, unsecured creditors. For example, the offering circular explained that the Notes Parent Guarantee was issued solely to satisfy EDMC's reporting obligations, that it could be released solely by operation of the release of any later guarantee EDMC issued to secured creditors, and that Noteholders should therefore not assign any value to the Notes Parent Guarantee. Marblegate holds Notes with a face value of $14 million but never held any secured debt.

As EDMC's financial position deteriorated, its debt burden became unsustainable. After negotiating with EDMC, a majority of secured creditors agreed in September 2014 to relieve the EDM Issuer of certain imminent payment obligations and covenants under the 2010 Credit Agreement. The resulting agreement was a new amended credit agreement entered in the fall of 2014 (the "2014 Credit Agreement"). As consideration for these changes, EDMC agreed to guarantee the secured loans (the "Secured Parent Guarantee").

Around the same time, a group of creditors formed an Ad Hoc Committee of Term Loan Lenders (the "Ad Hoc Committee") and established a Steering Committee, which is an intervenor-appellant in this appeal, to negotiate with EDMC.[2] The Steering Committee and EDMC eventually devised two potential avenues to relieve EDMC of its debt obligations.

The first option, which obtained only if creditors unanimously consented, was designed to result in (1) most of EDMC's outstanding secured debt being exchanged for $400 million in new secured term loans and new stock convertible into roughly 77 percent of EDMC's common stock, and (2) the Notes being exchanged for equity worth roughly 19 percent of EDMC's common stock. EDMC estimated that this first option would amount to roughly a 45 percent reduction in value for secured lenders and a 67 percent reduction in value for Noteholders.

The second option would arise only if one or more creditors refused to consent. Under that circumstance, a number of events would occur that together constituted the "Intercompany Sale." Secured creditors consenting

---

[2] The Ad Hoc Committee held 80.6 percent of the secured debt and 80.7 percent of the Notes. Of that total, the Steering Committee of the Ad Hoc Committee held 35.8 percent of secured debt and 73.1 percent of the Notes.

to the Intercompany Sale would first exercise their preexisting rights under the 2014 Credit Agreement and Article 9 of the Uniform Commercial Code (UCC) to foreclose on EDMC's assets. In addition, the secured creditors would release EDMC from the Secured Parent Guarantee. That release in turn would effect a release of the Notes Parent Guarantee under the Indenture. With the consent of the secured creditors (but without needing the consent of the unsecured creditors), the collateral agent would then sell the foreclosed assets to a subsidiary of EDMC newly constituted for purposes of the Intercompany Sale. Finally, the new EDMC subsidiary would distribute debt and equity only to consenting creditors and continue the business.

The Intercompany Sale was structured to incentivize creditors to consent. While non-consenting secured creditors would still receive debt in the new EDMC subsidiary, that debt would be junior to the debt of consenting secured creditors. Non-consenting Noteholders would not receive anything from the new company: though not a single term of the Indenture was altered and Noteholders therefore retained a contractual right to collect payments due under the Notes, the foreclosure would transform the EDM Issuer into an empty shell. In offering to exchange the Notes for equity in the

8

new EDMC subsidiary, therefore, EDMC and the Ad Hoc Committee explicitly warned Noteholders that they would not receive payment if they did not consent to the Intercompany Sale.

Except for Marblegate, all of EDMC's creditors (representing 98 percent of its debt) eventually consented to the Intercompany Sale.

2. Procedural History

Marblegate, the sole holdout, sued to enjoin the Intercompany Sale on the ground that it violated Section 316(b) of the Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77ppp(b). Marblegate Asset Mgmt. v. Educ. Mgmt. Corp., 75 F. Supp. 3d 592 (S.D.N.Y. 2014) ("Marblegate I"). Section 316(b) of the TIA, entitled "Prohibition of impairment of holder's right to payment," provides as follows:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder, except as to a postponement of an interest payment consented to as provided in paragraph (2) of subsection (a) of this section, and except that such indenture may contain

9

provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver, or loss of the lien of such indenture upon any property subject to such lien.

15 U.S.C. § 77ppp(b) (emphasis added).

Before the District Court, EDMC argued that "the right . . . to receive payment" is necessarily defined by the payment terms in the Indenture itself, such that Section 316(b) prohibits only non-consensual amendments to an indenture's core payment terms. Therefore, EDMC asserted, the Intercompany Sale complied with Section 316(b) because it did not amend any Indenture term and because Marblegate's right to initiate suit against the EDM Issuer to collect payment remained intact.

In response, Marblegate contended that although the contractual terms governing Marblegate's Notes had not changed, its practical ability to receive payment would be completely eliminated by virtue of the Intercompany Sale, to which it did not consent. Section 316(b), Marblegate warned, would be rendered meaningless if issuers and secured creditors could collaborate to restructure debt without formally amending any payment terms.

The District Court initially declined to grant a preliminary injunction but believed that Marblegate was likely to succeed on the merits of its TIA claim. Marblegate I, 75 F. Supp. 3d at 615–17. After reviewing the text and legislative history of Section 316(b), the District Court concluded that the TIA "protects the ability" of the Noteholders "to receive payment in some circumstances." Id. at 612–15. Even where the payment terms of an indenture are not explicitly modified by a transaction, the District Court held, Section 316(b) is violated whenever a transaction "effect[s] an involuntary debt restructuring." Id. at 614.

The Intercompany Sale occurred in January 2015. The foreclosure sale took place, the secured creditors released the Secured Parent Guarantee, the new EDMC subsidiary was capitalized with the EDM Issuer's old assets, and consenting bondholders participated in the debt-for-equity exchange. But Marblegate continued to hold out. And in light of the District Court's decision, EDMC and the Steering Committee refrained from releasing the Notes Parent Guarantee. Instead, they filed a counterclaim against Marblegate, seeking a declaration that the Notes Parent Guarantee could be released without violating the TIA.

Since the bulk of the Intercompany Sale was already completed, the subsequent bench trial focused on whether the District Court should permanently enjoin release of the Notes Parent Guarantee and thereby force EDMC to continue its guaranteed payment on Marblegate's Notes. On that question, the District Court ultimately sided with Marblegate by reiterating that the release of the Notes Parent Guarantee would violate Section 316(b). Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp., 111 F. Supp. 3d 542, 556–57 (S.D.N.Y. 2015) ("Marblegate II").

This appeal followed. At present, because EDMC was able to reduce its debt burden through the very transaction to which Marblegate objected, it currently has the assets to pay on Marblegate's Notes. Marblegate, as the owner of Notes that had been poised to receive only limited additional payments because of EDMC's pending insolvency, is now the only creditor receiving full payouts according to the original face value of its Notes.

## DISCUSSION

EDMC appeals the judgment on the ground that the District Court misinterpreted Section 316(b) of the TIA. We review the District Court's

12

conclusions of law de novo. See Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016).

To determine whether the release of the Notes Parent Guarantee would violate Section 316(b) of the TIA, we start first with the text of that provision. See N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp., 798 F.3d 125, 132 (2d Cir.), cert. denied sub nom. UnitedHealth Grp., Inc. v. Denbo, 136 S. Ct. 506 (2015). If resorting to the plain text alone fails to resolve the question, we test the competing interpretations against both the statutory structure of the TIA and the legislative purpose and history of Section 316(b). See United States v. Epskamp, 832 F.3d 154, 162–66 (2d Cir. 2016); Doe v. Cuomo, 755 F.3d 105, 110 (2d Cir. 2014).

1. Text

The core disagreement in this case is whether the phrase "right . . . to receive payment" forecloses more than formal amendments to payment terms that eliminate the right to sue for payment. 15 U.S.C. § 77ppp(b). We agree with the District Court that the text of Section 316(b) is ambiguous insofar as it "lends itself to multiple interpretations" that arguably favor either side on that issue. Marblegate I, 75 F. Supp. 3d at 611; see also Marblegate II, 111 F.

13

Supp. 3d at 547. Likewise, Marblegate conceded at oral argument that the interpretation it advances is not supported by reference to the plain text alone. See Oral Tr. 44:21–45:1.

On the one hand, Congress's use of the term "right" to describe what it sought to protect from non-consensual amendment suggests a concern with the legally enforceable obligation to pay that is contained in the Indenture, not with a creditor's practical ability to collect on payments. Cf. F.C.C. v. NextWave Pers. Commc'ns Inc., 537 U.S. 293, 302–03 (2003) ("[T]he plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation . . . ." (quotation marks omitted)); Dennis v. Higgins, 498 U.S. 439, 447 n.7 (1991) (defining "right" as "[a] legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act") (quoting Black's Law Dictionary 1324 (6th ed. 1990)). On the other hand, adding that such a right cannot be "impaired or affected" arguably suggests that it cannot be diminished, relaxed, or "otherwise affect[ed] in an injurious manner." See Humana Inc. v. Forsyth, 525 U.S. 299, 309–10 (1999) (quoting Black's Law Dictionary 752 (6th ed. 1990)).

14

To be sure, Marblegate's broad reading of the term "right" as including the practical ability to collect payment leads to both improbable results and interpretive problems. Among other things, interpreting "impaired or affected" to mean any <u>possible</u> effect would transform a single provision of the TIA into a broad prohibition on any conduct that could influence the value of a note or a bondholder's practical ability to collect payment. 15 U.S.C. § 77ppp(b). Furthermore, if the "right . . . to receive payment" means a bondholder's practical ability to collect payment, then protecting the "right . . . to institute suit for the enforcement of any such payment" would be superfluous, because limiting the right to file a lawsuit for payment constitutes one of the most obvious impairments of the creditor's practical ability to collect payment. <u>Id.</u> The "right . . . to receive payment" is not, in other words, so broad as to encompass the "right . . . to institute suit." <u>Id.</u> If for no other reason than the "general rule" that different statutory phrases "can indicate that different meanings were intended," <u>Sebelius v. Auburn Reg'l Med. Ctr.</u>, 133 S. Ct. 817, 825 (2013) (quotation marks omitted), these two rights are best viewed as distinct from one another. The former right, it seems to us, prohibits non-consensual amendments of core payment terms

15

(that is, the amount of principal and interest owed, and the date of maturity).

It bars, for example, so-called "collective-action clauses"—indenture provisions that authorize a majority of bondholders to approve changes to payment terms and force those changes on all bondholders. See NML Capital, Ltd. v. Republic of Argentina, 699 F.3d 246, 253 (2d Cir. 2012). The latter right (to sue) ensures that individual bondholders can freely sue to collect payments owed under the indenture. So construed, the right to sue clearly bars so-called "no-action clauses," which preclude individual bondholders from suing the issuer for breaches of the indenture, leaving the indenture trustee as the sole initiator of suit. See Cruden v. Bank of New York, 957 F.2d 961, 967–68 (2d Cir. 1992). An indenture that contains only a collective-action clause violates the "payment" right, not the "suit" right; an indenture that contains only a no-action clause violates the "suit" right, not the "payment" right.

Regardless, we agree with the District Court that the plain text of Section 316(b) is ultimately ambiguous and fails to resolve the principal question before us.

Nor does any party seriously contend that the structure of the TIA provides a clear answer to that question, as the dissenting opinion suggests.[3] At best, we have observed that "[n]othing in Section 316(b), or the TIA in general, requires that bondholders be afforded 'absolute and unconditional' rights to payment." Bank of New York v. First Millennium, Inc., 607 F.3d 905, 917 (2d Cir. 2010). So, for example, Section 316(a)(1) permits bondholder majorities to both waive past defaults and control the manner in which the indenture trustee pursues remedies. See 15 U.S.C. § 77ppp(a).[4] Our

---

[3] The dissent dismisses EDMC's argument about the structure of Section 316 as "unconvincing." We do not suggest that the text of Section 316(a) determines our reading of Section 316(b) or has any bearing on our ultimate analysis in this opinion. Therefore, the dissent's comparison of the permissive versus mandatory language in those provisions lacks relevance.

[4] Section 316(a) states, in relevant part:

> The indenture to be qualified—
> (1) shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to contain provisions authorizing the holders of not less than a majority in principal amount of the indenture securities or if expressly specified in such indenture, of any series of securities at the time outstanding (A) to direct the time, method, and place of conducting any proceeding for any remedy available to such trustee, or exercising any trust or power conferred upon such trustee, under such indenture, or (B) on behalf of the holders of all such indenture securities, to consent to the waiver of any past default and its consequences; or

17

statement in First Millennium seems at odds with the broad protection of

dissenting bondholders seeking to collect payment that Marblegate urges.

But it does not really help us determine whether Congress intended Section

316(b) to protect a broad right to actual payment or merely a right to sue for

payment under fixed indenture terms.  Notably, though, no other provision in

the TIA purports to regulate an issuer's business transactions, which would

be a likely result of Marblegate's broad reading of Section 316(b).

2. Legislative History

Because the text of Section 316(b) is ambiguous and the TIA's structure

fails to remove the ambiguity, we turn to legislative history.

Marblegate argues that the history of Section 316(b) demonstrates

Congress's broad intent to prohibit "an out-of-court debt restructuring that

has the purpose and effect of eliminating any possibility of receiving payment

---

(2) may contain provisions authorizing the holders of not less than 75 per centum in principal amount of the indenture securities or if expressly specified in such indenture, of any series of securities at the time outstanding to consent on behalf of the holders of all such indenture securities to the postponement of any interest payment for a period not exceeding three years from its due date.

15 U.S.C. § 77ppp(a).

18

under their notes." Appellee Br. 20; id. at 26. The District Court effectively adopted this view when it determined that "[p]ractical and formal modifications of indentures that do not explicitly alter a core term 'impair or affect' bondholders' rights to receive payment in violation of the Trust Indenture Act only when such modifications effect an involuntary debt restructuring." Marblegate I, 75 F. Supp. 3d at 614 (emphasis added and alterations omitted); see Marblegate II, 111 F. Supp. 3d at 554 ("[T]he purpose of the Act, as expressed consistently throughout the legislative history, was to prevent precisely the nonconsensual majoritarian debt restructuring that occurred here . . . ." (emphasis added)).

The District Court concluded that the legislative history compels this interpretation because at the time that Section 316(b) was drafted Congress did not contemplate the use of foreclosures as a method of reorganization. This reading also reflects the District Court's understandable concern that "a sufficiently clever issuer [would] gut the Act's protections" by using a foreclosure action instead of amending the indenture or filing for bankruptcy. Marblegate I, 75 F. Supp. 3d at 613; see also Marblegate II, 111 F. Supp. 3d at 555–56. The District Court thought the TIA's drafters "did not anticipate

19

precisely the mechanisms through which such a [nonconsensual majoritarian] restructuring might occur," but rather only "understood involuntary reorganizations to operate in a rather straightforward fashion: a majority of the bondholders would simply vote to amend the payment or interest provisions of the indenture." Marblegate II, 111 F. Supp. 3d at 554–55; id. at 555–56 (stating that "there is no reason to think that the [TIA] was targeted only at a particular method of restructuring").

Based on our review of the legislative history of Section 316(b), we conclude that Congress did not intend the broad reading that Marblegate urges and the District Court embraced. Starting in 1936, the Securities and Exchange Commission (SEC) published a comprehensive eight-part report examining the role of protective committees in reorganizations.[5] Part VI of that report, published in 1936 and entitled "Trustees Under Indentures" (the "1936 SEC Report"), led to enactment of the TIA. See 15 U.S.C. § 77bbb(a) (citing "reports of the [SEC]" as "the basis of facts" for promulgating the TIA).

[5] The eight-part report was entitled "Report on the Study and Investigation of the Work, Activities, Personnel, and Functions of Protective and Reorganization Committees." Throughout this opinion, we reference Part VI, published in 1936, Part I published in 1937, and Part VIII, published in 1940. See Securities and Exchange Comm'n, Report on the Study and Investigation of the Work, Activities, Personnel, and Functions of Protective and Reorganization Committees, Pts. 1, 6, 8 (1936-1940).

Subsequent congressional reports, testimony, and other contemporaneous statements by SEC officials relating to earlier bills also shaped the final legislation enacted in 1939.

Among other things, the drafters of the TIA appear to have been well aware of the range of possible forms of reorganization available to issuers, up to and including foreclosures like the one that occurred in this case but that the District Court concluded violated Section 316(b). Indeed, foreclosure-based reorganizations were widely used at the time the TIA was drafted. As we explain below, the history of the TIA, and of Section 316(b) in particular, shows that it does not prohibit foreclosures even when they affect a bondholder's ability to receive full payment. Rather, the relevant portions of the TIA's legislative history exclusively addressed _formal_ amendments and indenture provisions like collective-action and no-action clauses.

A. The 1936 SEC Report

Two sections of the 1936 SEC Report are relevant to the competing interpretations of Section 316(b) offered by the parties on appeal. Neither section supports Marblegate's position that Section 316(b) meant to prohibit involuntary debt restructurings like foreclosures.

First, a section of the Report entitled "Protection of Minorities," confirms for us that "'no-action clauses' were one of the evils that the Trust Indenture Act was intended to address." Marblegate II, 111 F. Supp. 3d at 547 (citing App'x 3375). The authors of this section also fretted about majoritarian control in various reorganization contexts, including in a passing reference to foreclosure sales, which noted only that foreclosure proceeds were unlikely to satisfy dissenting secured creditors absent active representation from the indenture trustee. See App'x 3375–76. Notably, however, the "Protection of Minorities" section did not support legislation requiring unanimous consent for all out-of-court restructurings. Instead, it prescribed only "a more active indenture trustee in reorganization negotiations." Marblegate II, 111 F. Supp. 3d at 548.

The other relevant section of the 1936 SEC Report, entitled "Reorganization by Contract," examined collective-action clauses. See App'x 3415 (discussing clauses allowing a "specified percentage of bondholders . . . to change or alter the terms of the bonds or of the indenture" and force those changes upon dissenting bondholders). The section identified the holdout problem inherent in requiring unanimous consent, but explained that the

22

proliferation of collective-action clauses meant that "the next cycle of reorganizations [would] take place on a voluntary basis without supervision of any court." App'x 3419. In short, this section's focus on "reorganization by contract" supports reading Section 316(b) to prohibit amendments to core payment terms, but provides virtually no support for Marblegate's view that Section 316(b) also prohibits other forms of reorganization, such as foreclosures. Cf. id. (deferring proposals for supervision of collective-action clauses, "since they are but one type of voluntary reorganization procedure").

The 1936 SEC Report otherwise evidenced that foreclosures were a known method of reorganization well before the enactment of the TIA in 1939. The Report identified foreclosure as a discrete method of reorganization that served as an alternative to the consensual modification of contractual payment terms. For example, the Report asserted that in the absence of collective-action clauses, "the release or amendment of the indenture could not be obtained without the consent of all of the bondholders or without the aid of foreclosure or bankruptcy court." App'x 3146 (emphasis added); see also id. (noting that it would be "necessary" for reorganizers

23

"faced with . . . a dissenting minority" to resort to "foreclosure proceedings").[6]

The authors of the 1936 SEC Report (and by inference the drafters of the TIA) were thus clearly aware that corporate reorganizations could be achieved through foreclosure. And yet the Report's concern with majoritarian control and the lack of judicial supervision was directed at "reorganization by contract," not foreclosure-based reorganizations.

### B. The 1938 Testimony of William O. Douglas

In 1938 then-SEC Chairman William O. Douglas, an expert in the field of corporate reorganizations, testified before Congress in support of the proposed Trust Indenture Act of 1938. Because Douglas had been the principal draftsman of the 1936 SEC Report and the "main proponent" of the legislation before Congress, the District Court appropriately paid significant attention to his testimony.

---

[6] As an illustration, the 1936 SEC Report cited Hollister v. Stewart, in which the New York Court of Appeals explained that the "scheme of reorganization" at issue "could only be made effective in one of two ways—by the consent of all the bondholders, or by a foreclosure cutting of their lien, and so enabling a new corporation to make its own mortgages in its own way." App'x 3146 (quoting Hollister v. Stewart, 111 N.Y. 644, 659 (1889)).

Like the 1936 SEC Report, Chairman Douglas's testimony narrowly addressed collective-action clauses and formal amendments to core payment terms. Quoting at length from the "Reorganization by contract" section of the 1936 SEC Report and responding to the "bogey" that the proposed legislation would require unanimous consent of bondholders to amend any indenture term, Douglas assured critics of the proposed legislation that "[t]here is absolutely nothing in the bill to prevent" amendment of the indenture by a majority, with one exception, which he described as follows:

> The effect of this exception is <u>merely to prohibit provisions</u> authorizing such a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest or a postponement thereof for more than 1 year. <u>In other words, this provision merely restricts the power of the majority to change those particular phases of the contract.</u>

App'x 2370 (emphasis added); <u>Trust Indentures, Hearings Before a Subcomm. Of the H. Comm. On Interstate and Foreign Commerce, House of Representatives on H.R. 10292</u>, 75th Cong. 35 (1938) (statement of William O. Douglas, Commissioner, SEC). Douglas thus explained that Section 7(m)(3) of the 1938 bill (which evolved into Section 316(b) of the TIA) meant "merely"

to prohibit indenture "provisions" that would allow majorities to amend core payment terms.

In holding that Section 316(b) prohibited involuntary out-of-court reorganizations like foreclosures, the District Court focused on the following additional testimony by Douglas: "Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this exception . . . . In other words, the bill does place a check or control over the majority forcing on the minorities a debt-readjustment plan." App'x 2370–71. First, in our view, this small shard of additional testimony related exclusively to a discussion about collective-action clauses, and we are inclined to confine it to that context.[7] Second, we understand Chairman Douglas's use of the term "debt-readjustment plan" to refer narrowly and specifically to formal changes to the contractual terms governing the debt. This is because such plans were widely

---

[7] Our sense that Douglas's testimony was narrowly focused is further supported by his reference to State negotiability laws. Douglas noted that provisions such as Section 7(m)(3) were already "perfectly standard in note and bond indentures," primarily because the provisions were necessary to preserve negotiability under State law. App'x 2370. To be "negotiable" under State law, "a bond had to represent a sum certain, due on a date certain. A bond issue that allowed a vote to change the maturity date or the sum due at that date would, if binding on nonassenters, destroy negotiability." Mark J. Roe, Chaos and Evolution in Law and Economics, 109 HARV. L. REV. 641, 661 (1996) (footnotes omitted). Again, we think the most reasonable reading of Douglas's testimony is that Section 7(m)(3) was aimed squarely at prohibiting collective-action clauses.

regarded as offering a form of reorganization distinct from foreclosure-based reorganizations. Indeed, as early as 1916 legal experts specifically distinguished these debt-readjustment plans from foreclosures. "Readjustment" plans were understood to change the terms of payment by the "voluntary action of the security holders," while corporate reorganizations were "usually" achieved through the "foreclosure of mortgages or the enforcement of the rights of creditors" and the transfer of the company's assets to a new corporation. Paul D. Cravath, The Reorganization of Corporations; Bondholders' and Stockholders' Protective Committees; Reorganization Committees; and the Voluntary Recapitalization of Corporations (March 1 and 8, 1916), in SOME LEGAL PHASES OF CORP. FIN., REORGANIZATION & REGULATION 153–55, 181 (1927). Subsequently, Part I of the SEC Report, published in 1937 and also headed by Douglas, reprised the distinction between "foreclosure" and "voluntary reorganizations," the latter of which included "debt readjustments or modifications." Securities and Exchange Comm'n, Report on the Study and Investigation of the Work, Activities, Personnel, and Functions of Protective and Reorganization Committees, Pt. 1, at 1 (1937).

27

In light of that history of the distinction between foreclosures and readjustment plans, we think it is highly unlikely that Douglas's carefully repeated references to a "debt-readjustment plan," made in the context of testimony describing "reorganization by contract," also meant to refer to the distinct contemporary technique of reorganization by foreclosure.[8]

### C.  The 1939 Testimony of Edmund Burke, Jr.

The year following Chairman Douglas's testimony, Edmund Burke, Jr.—then-Assistant Director of the Reorganization Division of the SEC, future Commissioner of the SEC, and described as a principal author of the TIA[9]—testified before Congress on behalf of the SEC in support of what would prove to be the final 1939 version of the TIA.  As with Douglas's testimony and the 1936 SEC Report, Burke's testimony sought to sharply limit the scope of Section 316(b) and made it clear that the provision prohibited only formal changes to an indenture's core payment terms.  Among other things, Burke

---

[8] The District Court pointed out that "Douglas's testimony was largely incorporated into the Senate's report on the 1938 Act," suggesting that the Senate's "understanding aligned with that of Douglas."  Marblegate II, 111 F. Supp. 3d at 550–51.

[9] Edmund Burke Jr., 88, S.E.C. Commissioner, N.Y. TIMES (May 16, 1993), http://www.nytimes.com/1993/05/16/obituaries/edmund-burke-jr-88-sec-commissioner.html.

emphasized that "[a]ll that the section [316(b)] does is preserve the individual holder's right to bring an action at law to collect his interest and principal in accordance with the terms of his contract, unless he has himself consented to a variation from that contract." App'x 2951–52 (emphasis added); Trust Indentures, Hearings Before a Subcomm. Of the H. Comm. On Interstate and Foreign Commerce, House of Representatives on H.R. 10292, 75th Cong. 35 (1939) (statement of Edmund Burke, Jr., Assistant Director, Reorganization Division, SEC).[10]  Burke also referred to the SEC's analysis of sample corporate indentures, which had been submitted to Congress and which described provisions similar to Section 316(b) as "preserv[ing] the right to the individual bondholders to enforce the payment of principal and interest at their respective due dates." App'x 2923.

---

[10] Burke also echoed Chairman Douglas's testimony that provisions similar to Section 316(b) were already in "practically every indenture" outstanding, because an indenture that allowed non-consensual alteration of payment terms would not be negotiable under many State laws.  App'x 2952.  But the SEC worried about the increasing frequency with which indentures included collective-action clauses.  App'x 3415–16.  A principal purpose of Section 316(b), then, was to ensure that such clauses would no longer be included in TIA-qualified indentures.  Id.

### D. House and Senate Reports

The House and Senate Reports on the final version of the TIA add little to our analysis but are worth briefly mentioning. Both reports repeated Douglas's assertion that Section 316(b) was intended to prevent "[e]vasion of judicial scrutiny of debt-readjustment plans." App'x 3274, 3337; H.R. Rep. 76–1016, at 56 (1939); S. Rep. No. 76–248, at 26 (1939). But both reports also confirmed that Section 316(b) "does not prevent the majority from binding dissenters by other changes in the indenture or by a waiver of other defaults." App'x 3274, 3338. It was, we think, clear to Congress that such changes and alterations might impair a bondholder's practical ability to recover payment without violating Section 316(b).

### E. 1940 SEC Report

Finally, Part VIII of the SEC Report, published a year after the TIA's enactment,[11] reinforces our conclusion that foreclosures such as the one the

---

[11] We are mindful that "subsequent history is less illuminating than the contemporaneous evidence." Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers, 531 U.S. 159, 170 & n.5 (2001); see Bob Jones Univ. v. United States, 461 U.S. 574, 600–01 (1983). In this instance, the 1940 SEC Report that immediately followed the TIA's enactment supports our interpretation of the legislative history and exposes errors in the District Court's historical analysis. Cf. Wolf v. Weinstein, 372 U.S. 633, 639 n.6 (1963) (citing 1940 SEC Report to interpret purpose of 1934 statute).

District Court deemed prohibited in this case were in in fact contemplated by the drafters of Section 316(b). See Securities and Exchange Comm'n, Report on the Study and Investigation of the Work, Activities, Personnel, and Functions of Protective and Reorganization Committees, Pt. 8 (1940) ("1940 SEC Report"). The 1940 SEC Report provided a comprehensive study of the decades-long use of foreclosure proceedings to effect reorganizations and constitutes a direct rejoinder to the District Court's assertion that the drafters of the TIA were unaware of such proceedings. See 1940 SEC Report, Sec. II. Particularly compelling is the Report's discussion of the role of junior creditors in foreclosure-based reorganizations. In characterizing the choice faced by junior creditors when deciding whether to participate in foreclosure-based reorganizations, the 1940 SEC Report noted that "the participation in the plan given to junior creditors was the product of practical reasons, not legal compulsion." Id. at 137 (emphasis added). And in comparison to dissenting secured creditors entitled to a pro rata distribution of foreclosure proceeds, the 1940 SEC Report noted that if junior creditors "refused participation in the plan, they were thrown back to participation in such of the debtor's assets as to which senior creditors could lay no prior claims,"

31

which was "at best nominal." Id. The 1940 SEC Report also discussed Supreme Court decisions that prohibited unsecured creditors from challenging foreclosure-based reorganizations as a fraudulent conveyance, so long as they had previously been given a "fair offer" to participate in the reorganization (that is, an offer that preserved the priority of their unsecured claims). Id. at 52–57 (discussing N. Pac. Ry. Co. v. Boyd, 228 U.S. 482 (1913); Kansas City Terminal Ry. Co. v. Cent. Union Tr. Co. of N.Y., 271 U.S. 445 (1926)).[12] Finally, the 1940 SEC Report recognized that some States permitted private, non-judicial foreclosure sales to be used in reorganizations. Yet nowhere does the Report "suggest that reorganizations implemented through [private foreclosure sales] would conflict with a holder's right to receive payment," Harald Halbhuber, Debt Restructurings and the Trust Indenture Act, 25 AM. BANKR. INST. L. REV. (forthcoming Winter 2017) (manuscript at 24), https://ssrn.com/abstract=2782290 ("Halbhuber, Debt Restructurings"), or that foreclosure-based reorganizations were prohibited by the TIA. To the contrary, the Report's only references to the TIA related exclusively to the

---

[12] See also id. at 54 n.191 ("In practical effect, if the general creditor declined a 'fair offer,' his alternative would be at best a nominal share of the sale price, and usually nothing.").

power of the indenture trustee as an active representative of bondholders. See 1940 SEC Report at 187; id. at 341 n.13 (reprinting the "conclusions and recommendations" set out in the 1936 SEC Report, the "substance" of which "was enacted into law by the Trust Indenture Act of 1939").

Our review of the testimony and reports leading up to and immediately following the enactment of Section 316(b) convinces us, in sum, that Congress sought to prohibit formal modifications to indentures without the consent of all bondholders, but did not intend to go further by banning other well-known forms of reorganization like foreclosures.

### F.  Textual Changes

Marblegate separately points to the evolution of the text of Section 316(b) through its enactment in 1939 to argue that the final text substantively broadened the TIA's protections of the minority bondholder's right from "a mere right to sue into a more substantive right" to actually "receive payment

of the principal and interest." Marblegate II, 111 F. Supp. 3d at 554.[13]  We are not persuaded.

We find little if any textual support for the proposition that a new substantive right to receive payment was added to the final version of Section 316(b).  To the contrary, the earlier 1938 version of the bill already included that right.  Section 7(m)(3) of the 1938 version (the precursor to both Section 316(a) and Section 316(b)) not only secured the right of bondholders to "bring[] [an] action to collect the principal of and interest upon the indenture securities" when due, but also prohibited both waiver of "a default in the payment of the principal . . . upon the date of maturity" and the postponement of interest payments for more than a year.[14]  Section 7(m)(3)'s

---

[13] See also id. at 555 ("[T]o interpret Section 316(b) as protecting merely the right to sue for payment, and not any substantive right to receive such payment, would be unfaithful to the text and the drafting history.").

[14] Section 7(m)(3) stated in relevant part:

> (m) The Indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public Interest and the interest of investors with respect to the following matters —
> (3) The rights, powers, and remedies of the indenture security holders and the manner in which and conditions upon which such rights, powers and remedies may be exercised, including the rights, powers and remedies of the indenture security

limitation on postponement of interest payments was moved to Section 316(a)(2) of the TIA. Compare App'x 2347–48 (Section 7(m)(3)), with 15 U.S.C. § 77ppp(a)(2). Meanwhile, the language in Section 7(m)(3) relating to the right to bring suit and the prohibition on waiving a default in the payment of principal were reformulated and relocated to Section 316(b). Section 316(a)(2) no longer required a reference, originally found in Section 7(m)(3), to a prohibition on waiver of a principal default because that prohibition was made effective by Section 316(b). Likewise, the limitation on interest postponements was expressly carved out as the only exception to Section 316(b)'s bar on amendments to payment terms. See § 77ppp(b)

---

holders with respect to . . . (B) bringing action to collect the principal of and interest upon the indenture securities upon their respective due dates . . . . The indenture to be qualified may contain provisions authorizing: the holders of not less than a majority in principal amount of the indenture securities at the time outstanding to consent to the postponement of any interest payment for a period not exceeding one year from its due date, or to the waiver of any default and its consequences, except a default in the payment of the principal of any indenture security upon the date of maturity specified therein, and except that a default in the payment of interest shall not be waived unless payment of all arrears of interest not so postponed shall have been made or provided for.

App'x 2347–48 (emphasis added); Trust Indenture Act of 1938, H.R. 10292, 75th Cong. § 7(m)(3) (3rd Sess. 1937) (1938 House Hearings at 12–13).

(forbidding impairment of right to receive interest, "except as to postponement of an interest payment consented to as provided in paragraph (2) of subsection (a)").

Again, the legislative history supports our view of the textual evolution of Section 7(m)(3) into Section 316(a) and 316(b). First, Chairman Douglas testified that Section 7(m)(3) prohibited non-consensual amendments to core payment terms and eliminated collective-action clauses. His testimony is particularly hard to square with the District Court's conclusion that Section 7(m)(3) contained only a "suit" right, not a "payment" right. Second, Edmund Burke of the SEC did not mention a major substantive addition to the final 1939 version of the bill. Instead, Burke provided the same explanation of Section 316(b) (and its precursor) that the SEC had advanced since 1936. See App'x 2952. Finally, upon reintroduction of the TIA on April 4, 1939, the Chairman of the House Subcommittee on Interstate and Foreign Commerce introduced a "statement in explanation" that outlined five key reasons for the changes that occurred between the 1938 and 1939 versions of

the bill.[15]  See App'x 2668.  As even the District Court acknowledged, none of these reasons mentioned an intent to expand the 1939 bill to encompass the "practical ability" to collect payment.  See Marblegate II, 111 F. Supp. 3d at 555 ("[T]he legislative history does not reveal a specific intent to strengthen the protections of Section 316(b).").  While changes to a statute's text are presumed to be intentional, cf. Doe v. Chao, 540 U.S. 614, 623 (2004), the changes to Section 316(b) are best understood by reference to contemporaneous explanations for those changes in the legislative record.

3. Workability and Dissenting Bondholder Remedies

Finally, we highlight an additional difficulty with Marblegate's interpretation of Section 316(b) and address a potential concern with our holding.

Marblegate's interpretation of Section 316(b) requires that courts determine in each case whether a challenged transaction constitutes an "out-

---

[15] For example, while the 1938 version of the bill vested discretion in the SEC to regulate indenture provisions, the 1939 version of the bill was altered to mandate that all qualified indentures contain certain provisions, including Section 316(b).  As Congressman William P. Cole, the Chairman of the Subcommittee, explained:  "All of the requirements of the original bill [were] converted into specific statutory requirements" that could be directly incorporated into indentures.  App'x 2668 (emphasis added).  In this way, "compliance with the bill" was "greatly simplif[ied]," and the SEC no longer needed to exercise its review discretion to ensure compliance.  Id.

of-court debt restructuring . . . designed to eliminate a non-consenting holder's ability to receive payment." Appellee Br. 21; see also id. at 20, 40–41, 47–48 ("purpose and effect"); Marblegate I, 75 F. Supp. 3d at 615 (plan's "intent" was made "plainly known"). The interpretation thus turns on the subjective intent of the issuer or majority bondholders, not the transactional techniques used.[16] But we have expressed a particular distaste for interpreting boilerplate indenture provisions based on the "relationship of particular borrowers and lenders" or the "particularized intentions of the parties to an indenture," both of which undermine "uniformity in interpretation." See Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048 (2d Cir. 1982).[17]

---

[16] Cf. John C. Coffee, Jr. & William A. Klein, Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations, 58 U. CHI. L. REV. 1207, 1224–25 & n.55 (1991) (noting that the TIA does not prohibit amendment of other "important protective covenants" in an indenture besides core payment terms, the threat of which could be used to coerce holdout bondholders).

[17] Compare Sharon Steel, 691 F.3d at 1048 ("Just such uncertainties would be created if interpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation."), with BOKF, N.A. v. Caesars Entm't Corp., 144 F. Supp. 3d 459, 474–75 & n.86 (S.D.N.Y. 2015) (adopting Marblegate's interpretation of Section 316(b), but sending to the factfinder the question of whether the "overall effect" of the transactions at issue was "a debt restructuring or a series of routine corporate transactions").

Marblegate similarly argues that the right to receive payment is impaired "when the source of assets for that payment is deliberately placed beyond the reach of non-consenting noteholders."[18] Appellee Br. 25. But this description could apply to <u>every</u> foreclosure in which the value of the collateral is insufficient to pay creditors in full. <u>See</u> N.Y. UCC §§ 9-615, 9-617(a)(3). Marblegate and the District Court respond that Section 316(b) permits "genuinely adversarial" foreclosures but prohibits the type of foreclosure that occurred here. <u>Marblegate I</u>, 75 F. Supp. 3d at 615–16. But neither the text nor the legislative history of Section 316(b) supports a distinction between adversarial and "friendly" foreclosures.[19] Nor do we agree with the District Court's description of the negotiations. To the contrary, our reading of the record convinces us that the negotiations were

---

[18] The dissent similarly objects that Marblegate's "legal claim was surely impaired by actions that intentionally made the company unable to pay any judgment awarded against it." But the Intercompany Sale to which Marblegate is objecting allowed EDMC to reduce its debt burden and maintain federal funding such that it has the assets to pay legal claims. Without that transaction, EDMC would be unable to meet these legal claims that the dissent seeks to protect.

[19] Marblegate also fails to explain why Section 316(b) would permit a purely adversarial foreclosure that eliminates any recovery for unsecured creditors but prohibit a friendly foreclosure designed to maximize the going-concern value of the assets and provide unsecured creditors the only possibility of recovery. We note that the UCC appears to contemplate this type of cooperation. <u>Cf.</u> N.Y. UCC §§ 9-601(a), 9-609(c).

clearly adversarial before the parties agreed on a course to preserve the value of the assets. The negotiations leading to the creation and release of the Secured Parent Guarantee were, in our view, also adversarial.

Limiting Section 316(b) to formal indenture amendments to core payment rights will not leave dissenting bondholders at the mercy of bondholder majorities. Our holding leaves Marblegate with some recourse. By preserving the legal right to receive payment, we permit creditors to pursue available State and federal law remedies. (And of course, sophisticated creditors, like Marblegate, can insist on credit agreements that forbid transactions like the Intercompany Sale.) Having foregone the protection of bankruptcy in this case, the secured creditors and EDMC have also shed the protection of the Bankruptcy Code, including a discharge order. See 11 U.S.C. §§ 363(f), 524. The foreclosure in this case therefore may be challenged by other creditors under State law. See, e.g., N.Y. UCC §§ 9-610(b), 9-625(b), (c)(1); see also SNCB Corp. Fin. Ltd. v. Schuster, 877 F. Supp. 820, 827–29 (S.D.N.Y. 1994), aff'd, 71 F.3d 406 (2d Cir. 1995). Moreover, where creditors foreclose on a debtor's collateral and sell the collateral to a new entity meant to carry on the business, the debtor's other creditors may be able

40

to sue the new entity under State law theories of successor liability or fraudulent conveyance. See, e.g., Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp., 635 F.3d 48, 53–55 (2d Cir. 2011) (successor liability); Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990) (fraudulent conveyance).[20] We obviously take no view on the potential merit of any State law or federal law claims in the context of the Intercompany Sale at issue here.

**CONCLUSION**

To summarize, we hold that Section 316(b) of the TIA does not prohibit the Intercompany Sale in this case. The transaction did not amend any terms of the Indenture. Nor did it prevent any dissenting bondholders from initiating suit to collect payments due on the dates specified by the Indenture.

---

[20] See also Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 267 (1st Cir. 1997) (UCC "commercial reasonableness" and successor liability, noting that "existing case law overwhelmingly confirms that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability"); Kaiser Found. Health Plan v. Clary & Moore, P.C., 123 F.3d 201, 207–09 (4th Cir. 1997) (successor liability); Stoumbos v. Kilimnik, 988 F.2d 949, 962 (9th Cir. 1993) ("The mere fact that the transfer of assets involved foreclosure on a security interest will not insulate a successor corporation from liability where other facts point to continuation."); cf. Orr v. Kinderhill Corp., 991 F.2d 31, 35–36 (2d Cir. 1993) (holding that asset transfer to spinoff created in context of restructuring, which favored new stockholders over judgment creditor, constituted fraudulent conveyance); Halbhuber, Debt Restructurings (manuscript at 12–17).

Marblegate retains its legal right to obtain payment by suing the EDM Issuer, among others. Absent changes to the Indenture's core payment terms, however, Marblegate cannot invoke Section 316(b) to retain an "absolute and unconditional" right to payment of its notes. First Millennium, 607 F.3d at 917.

For the foregoing reasons, the judgment is **VACATED** and the case is **REMANDED** to the District Court for further proceedings consistent with this opinion.

STRAUB, *Circuit Judge*, dissenting:

The question before this Court is whether Section 316(b) of the Trust Indenture Act (the "TIA") prohibits Defendant-appellant Education Management Corporation ("EDMC") from engaging in an out-of-court restructuring that is collusively engineered to ensure that certain minority bondholders receive no payment on their notes, despite the fact that the terms of the indenture governing those notes remain unchanged. Because the plain text of the statute compels the conclusion that it does, I would answer that question in the affirmative and uphold the judgment of the District Court. I therefore respectfully dissent.

I begin my analysis with the language of Section 316(b) of the TIA. *See United States v. DiCristina*, 726 F.3d 92, 96 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1281 (2014) (quoting *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) ("When interpreting a statute, we 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'"). "Where the statute's language is 'plain, the

sole function of the courts is to enforce it according to its terms.'"

*Kozeny*, 541 F.3d at 171 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). Indeed, it has been pronounced "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

In interpreting the language of the statute, I am guided by standard principles of statutory construction. Statutes should be read so as "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)). *See also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting that it is a "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"); *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994) ("[C]ourts will avoid statutory interpretations that render provisions superfluous."). Further, "[t]he 'whole act' rule of statutory construction exhorts us to read a section

of a statute not 'in isolation from the context of the whole Act' but to 'look to the provisions of the whole law, and to its object and policy.'" *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (quoting *Richards v. United States*, 369 U.S. 1, 11, (1962)). Here, the plain language of Section 316(b) requires the conclusion that the Intercompany Sale as envisioned in the Restructuring Support Agreement violates the TIA.

Section 316(b) of the TIA reads as follows:

**(b) Prohibition of impairment of holder's right to payment**
Notwithstanding any other provision of the indenture to be qualified, *the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security*, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, *shall not be impaired or affected without the consent of such holder* . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

As delineated by the District court, "[t]he text poses two questions: what does the 'right . . . to receive payment' consist of, and when is it 'impaired or affected' without consent?" *Marblegate*

*Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 111 F. Supp. 3d 542, 546 (S.D.N.Y. 2015) ("*Marblegate II*"). EDMC and the Steering Committee[1] (together, "Appellants") read the text narrowly, with EDMC arguing that "[o]n its face, the statutory text is unambiguous in protecting only the 'right' of a noteholder to receive payment when due and to sue for enforcement of such payment." EDMC App. Br. 19; *see also* Steering Committee App. Br. 20 ("The language of the TIA demonstrates that Section 316(b) was intended to be a narrow limitation on the ability of noteholders to delegate to a Noteholder Majority the power to alter their right to payment of principal and interest through amendments of the indenture's provisions, and not a broad proscription on all out-of-court restructurings, however effected.") By contrast, Marblegate reads the text broadly, arguing that "the right to receive payment is 'impaired' or 'affected' when the ability to receive payment under

---

[1] "Steering Committee" refers to the Steering Committee for the Ad Hoc Committee of Term Loan Lenders of EDMC, an intervenor-appellant in this appeal.

the bond is stripped away—not only through formal amendment of a bond's payment terms, but also by other means."  Marblegate App. Br. 24.  I am persuaded by Marblegate's reading of the statute.[2]

The terms "right," "impair," and "affect" are undefined in the TIA, so we must look to their ordinary meaning.  *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").  A "right" is typically defined as "[s]omething that is due to a person by just claim, legal guarantee, or moral principle," or "[a] legally enforceable claim that another will do or will not do a given act."  Black's Law Dictionary (10th ed. 2014).  On the basis of this definition, Appellants argue that actions only violate Section 316(b) if those actions affect the "legal entitlement" to payment – i.e. by altering the terms of the bond so that a bondholder can no longer

---

[2] Although Marblegate agreed at oral argument that the limiting principle it proposed requires reference to the legislative history, *see* Oral Tr. 44:10—45:17, this acknowledgment does not alter its reading of the plain text as covering the actions at issue in this case.

legally *claim* the right to receive payment under their original terms.

Nothing in Section 316(b), Appellants urge, entitles bondholders to *actual* payment on their notes.

This argument, however, nearly eliminates the import of the terms "impair" and "affect" and imposes qualifications in Section 316(b) that simply do not exist. The term "impair" means "to diminish the value of." *Id; see also Humana Inc. v. Forsyth*, 525 U.S. 299, 301 (1999) ("The dictionary defines 'impair' as to weaken, make worse, lessen in power, diminish, relax, or otherwise affect in an injurious manner.") The term "affect" means "to produce an effect on; to influence in some way." Black's Law Dictionary (10th ed. 2014). Even defined as a "legal entitlement" or "claim," it is unquestionable that the "right" to receive payment can be "diminished" or "affected" without actual modification of the payment terms of the indenture. By making it impossible for a company to pay the amount due on its notes, for example, the "right" to receive payment is "diminished" because it literally has

been made worthless.  Surely, a bondholder's right or "legal entitlement" to receive payment is impaired when actions are taken to ensure that the bondholder either consents to a change in his payment terms or receives *no* payment on his notes at all.[3]  *See* Black's Law Dictionary (10th ed. 2014) (explaining that the term "impair" is "commonly used in reference to diminishing the value of a contractual obligation to the point that the contract becomes invalid *or a party loses the benefit of the contract*" (emphasis added)).

Had Congress intended merely to protect against modification of an indenture's payment terms, it could have so stated.  Nothing in the language of Section 316(b), however, cabins the prohibition on impairing or affecting the "right . . . to receive payment" to mere

---

[3] Of course, there are a number of actions that could be said to impair the right of noteholders to receive payment, ranging from poor business decisions at one end to deliberate attempts to devalue the business at the other.  But whereas noteholders clearly give their implied consent for ordinary course business transactions and decisions to be carried out, and are compensated for the risk that the business will be run unsuccessfully by the interest that they receive on the notes, the same cannot be said of a deliberate act to render their right to receive payment worthless.  In that latter circumstance, Section 316(b) requires the noteholder's explicit consent.

*amendment* of the indenture. In fact, that Congress used the broad phrase "impaired or affected" implies that it did not intend Section 316(b) to be limited in its scope to mere amendments. Because we are compelled to give every term in a statute effect, our reading of the statute must account for rather than ignore this phraseology. *Cf. United States v. Woods*, 134 S. Ct. 557, 567 (2013) (explaining that the "ordinary use" of the word "or" is "almost always disjunctive, that is, the words it connects are to be given separate meanings" (internal quotation marks omitted)). Further, Section 316(b) is written in the passive voice; its prohibition is nowhere limited to actions taken by a noteholder majority. Despite Appellants' arguments to the contrary, nothing in the text of the statute requires the narrow reading that Section 316(b) merely prohibits modification of an indenture's core payment terms (amount and due date) by noteholder majority action without consent of the individual noteholder.

Although not determinative to my analysis, it is worth

considering the structural argument that Appellants make in further support of their textual interpretation. *See* EDMC App. Br. 21 ("The statute's focus on legal entitlements is reaffirmed by its structure.); Steering Committee App. Br. 21. This argument, however, is also unconvincing. Section 316(a) of the TIA relates to collective action clauses—i.e., clauses permitting a certain percentage of holders to consent to changes to the indenture terms.[4] Unlike Section 316(b),

---

[4] Section 316(a) states in relevant part:

**(a) Directions and waivers by bondholders**

The indenture to be qualified--

> **(1)** shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to contain provisions authorizing the holders of not less than a majority in principal amount of the indenture securities or if expressly specified in such indenture, of any series of securities at the time outstanding (A) to direct the time, method, and place of conducting any proceeding for any remedy available to such trustee, or exercising any trust or power conferred upon such trustee, under such indenture, or (B) on behalf of the holders of all such indenture securities, to consent to the waiver of any past default and its consequences; or
> **(2)** may contain provisions authorizing the holders of not less than 75 per centum in principal amount of the indenture securities or if expressly specified in such indenture, of any series of securities at the time outstanding to consent on behalf of the holders of all such indenture

-9-

which is mandatory, Section 316(a) is permissive. It states, for example, that an indenture *may* contain provisions permitting the majority of noteholders to consent on behalf of all noteholders "to the waiver of any past default and its consequences." 15 U.S.C. §77ppp(a). It also permits indentures to contain provisions whereby 75% of noteholders can consent on behalf of all noteholders "to the postponement of any interest payment for a period not exceeding three years from its due date." *Id.*

Appellants argue that Section 316(b) should thus be read as an "exception" to 316(a); while 316(a) states what collective action clauses are permitted, 316(b) simply states what collective action clauses are *not* permitted. But nothing in either of the two provisions in Section 316 indicates that 316(b) is meant to be an exception to 316(a). Moreover, as Marblegate urges, it is perhaps

securities to the postponement of any interest payment for a period not exceeding three years from its due date.

15 U.S.C. § 77ppp(a).

more reasonable to view 316(a)(2)—which permits a 75% vote to defer interest for three years—as an exception to 316(b).  *See* 15 U.S.C. §77ppp(b) (prohibiting modification of right to receive payment without noteholder's consent "except . . . as provided in paragraph (2) of subsection (a) of this section.").

At a minimum, the language of Section 316(b) covers the actions taken by EDMC and the Steering Committee here.  The Restructuring Support Agreement presented Marblegate with what the District Court rightfully deemed a Hobson's choice—to accept a modification of the payment terms of its notes, or to receive no payment at all.  The Intercompany Sale, which stripped the issuers of their assets and removed the parent guarantee, ensured that no future payments of principal or interest would be made on the notes.  This scheme did not simply "impair" or "affect" Marblegate's right to receive payment—it annihilated it.[5]  The methodology used

---

[5] Appellants argue that Marblegate's right to receive payment was not annihilated, or even impaired or affected, by their actions because Marblegate

-11-

to accomplish that annihilation is of little interest when the end result is squarely at odds with the plain intent of Section 316(b). *See In re Olson*, 818 F.2d 34, 47 (D.C. Cir. 1987) (noting that interpreting a statute in a manner that "would undercut [its] plain intent . . . and permit the accomplishment by indirect means of a result that the statute prohibits being accomplished by direct means" would produce "an unreasonable result"). We therefore need look no further than the plain text of Section 316(b) to hold that the

still maintains a legal claim for payment and it may sue, perhaps in state court, for enforcement of that payment. But this argument misses the point. Even if Marblegate maintains a "legal claim" for payment upon which it can sue, that legal claim was surely impaired by actions that intentionally made the company unable to pay any judgment awarded against it. The effect of the Intercompany Sale was to transfer all or substantially all of EDMC's assets to a new, wholly owned subsidiary of EDMC, and EDMC explicitly warned that this meant its assets "would not be available to satisfy the claims of [dissenting] Holders." App'x 52. The Intercompany Sale thus deliberately placed EDMC's assets beyond the reach of non-consenting noteholders, while the effect of the release of the parent guarantee would be to eliminate noteholders' ability to seek payment from EDMC's guarantor. We have held that a company's complete inability to pay a monetary judgment constitutes a risk of irreparable harm when a company is nearly insolvent in the context of preliminary injunctions. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999). Surely, then, a bondholder's right to receive payment on its bond by the bringing of a lawsuit has been impaired or harmed when the company has rendered itself unable to satisfy any monetary judgment. While the right to sue remains intact, the ability to recover anything as a result of that suit has vanished, rendering the suit meaningless.

Intercompany Sale, as envisioned by the Restructuring Support Agreement, violates the TIA. Based on the plain terms of Section 316(b), I would hold that an out-of-court debt restructuring "impairs" or "affects" a non-consenting noteholder's "right to receive payment" when it is designed to eliminate a non-consenting noteholder's ability to receive payment, and when it leaves bondholders no choice but to accept a modification of the terms of their bonds.

I am cognizant of the parade of horrors that Appellants predict will result from interpreting the TIA in the manner above. However, threatening dire commercial consequences from the refusal to read a statute in a manner inconsistent with its plain language is not a sufficient basis to override the correct interpretation of the law. We must not forget the long-standing imperative that *making* law is the job of the legislature and not of the courts. Where, as here, the statute's language is plain and unambiguous, the "sole function of the courts is to enforce it

-13-

according to its terms." *Ron Pair Enters., Inc.*, 489 U.S. at 241 (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917); *accord DiCristina*, 726 F.3d at 96. Certain undesirable consequences might well arise from the fact that Section 316(b) prohibits actions such as those taken by EDMC in this case. But "[r]esolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress." *United States v. Rodgers*, 466 U.S. 475, 484 (1984). *See also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576 (1982) ("The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this Court. Congress may amend the statute; we may not.").[6] The bond market has surely undergone

---

[6] Significantly, Congress recently abandoned two proposals to amend § 316(b), first through a 2015 highway bill rider and then through an omnibus appropriations legislation rider. The proposals would have narrowed the definitions of impairment of the right to payment and the right to institute suit for nonpayment. In response to the latter proposal, 18 law professors sent a letter to members of Congress urging them to reject the proposed amendment, which would have been undertaken without legislative hearings or public comment, because the amendment "could have broad negative unintended consequences in the securities market." Letter sponsored by Georgetown University Law Center to Members of Congress (Dec. 8, 2015). Several major asset managers also sent a letter expressing their disapproval for amendment

significant alterations since the enactment of the TIA, including that the main players are now sophisticated corporate entities on both sides. But it is not for this Court to alter the TIA on its own accord, and "none of this establishes why the plaintiffs should be barred from vindicating their rights under the [TIA]" as it currently stands. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013). "Our role is not to craft a resolution that will solve all the problems that might arise in hypothetical future litigation involving other bonds and other [parties]," *id.*, but it is instead to interpret the TIA in as fastidious a manner as we are able. In so doing I would hold that Section 316(b) of the TIA bars the actions at issue in this case.

---

without the opportunity for hearings and public comment, as "the adverse consequences to the economy and to capital markets could be significant." Letter from BlackRock, Inc, DoubleLine Group LP, Oaktree Cap. Mgmt., L.P., Pac. Inv. Mgmt. Co, T. Rowe Price Assocs., & Western Asset Mgmt. Co. to Members of Congress (Dec. 14, 2015). This past March, the Chamber of Commerce sent a letter "encourag[ing] Congress to clarify the rules of the road on this important subject." Letter from R. Bruce Josten, U.S. Chamber of Commerce, to Members of Congress (Mar. 31, 2016). That Congress has to date declined the invitation to take up this issue does not provide this Court with a directive to override and narrow the clear language of § 316(b).

**CONCLUSION**

Because the Intercompany Sale as proposed under the Restructuring Support Agreement would have the effect of imposing on Marblegate a choice between a modification of their core payment terms or receiving no payment at all—thereby clearly impairing Marblegate's right to receive payment under the original terms of the indenture—I would hold that it violates the plain text of Section 316(b) of the Trust Indenture Act and affirm the judgment of the District Court. Our system of governance is organized such that Congress is tasked with writing the law and the federal courts are tasked with applying, not rewriting, it. If Congress and the parties affected by the TIA are unsatisfied with the law's consequences, it is for Congress rather than this Court to amend it. I therefore respectfully dissent.