# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 42
CNH Diversified Opportunities
Master Account, L.P., et al.,
      Appellants,
      v.
Cleveland Unlimited, Inc., et al.,
      Respondents.

James H. Millar, for appellants.
James M. McGuire, for respondents.

GARCIA, J.:

After the issuer defaulted, plaintiffs, the holders of a minority in principal amount

of senior secured debt, brought this lawsuit against the debtor and its guarantors to recover

payment of principal and interest. We are called upon to determine whether plaintiffs'

right to sue for payment on the notes survived a strict foreclosure, undertaken by the trustee at the direction of a group of majority bondholders over plaintiffs' objection, that purported to cancel the notes. We hold that it did, and therefore modify the order of the Appellate Division by reversing the grant of summary judgment to the defendants and granting partial summary judgment to the plaintiffs.

Facts

In December 2005, defendant Cleveland Unlimited, Inc. (Cleveland Unlimited), a telecommunications company, issued $150 million of "senior secured" debt in the form of "Notes" pursuant to an indenture agreement (the Indenture). The Notes had a five-year term and required Cleveland Unlimited to pay interest to holders of the Notes (Noteholders or Holders) on a quarterly basis up to and including the maturity date, at which point the principal also became due. The Indenture named Cleveland Unlimited as the "Issuer" of the Notes, eighteen of Cleveland Unlimited's subsidiaries and affiliates as the "Guarantors," and U.S. Bank National Association (U.S. Bank) as the Indenture "Trustee." At the same time the Indenture was executed, the Issuer, the Guarantors, and the Trustee executed a Collateral Trust Agreement and a Security Agreement (collectively, Indenture Documents).[1] In April 2010, plaintiffs purchased approximately $5 million of the Notes in the secondary market, amounting to 3.33% of the outstanding principal value.[2]

---

[1] The Indenture also appointed U.S. Bank as the "Collateral Trustee." U.S. Bank, in its role as both Indenture Trustee and Collateral Trustee, will be referred to as the "Trustee."
[2] Plaintiffs are CNH Diversified Opportunities Master Account, L.P., AQR Delta Master Account, L.P., AQR Delta Sapphire Fund, L.P., and AQR Funds—AQR Diversified Arbitrage Fund (collectively, Minority Noteholders or plaintiffs).

At issue in this case are certain provisions in the Indenture Documents governing the rights of the Noteholders to receive payment, the remedies available in the event of default, and the power of a majority of Noteholders to direct the Trustee's choice of remedy. Section 6.07 of the Indenture, titled "Rights of Holders To Receive Payment," provides:

> "Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of, premium, if any, and interest and Additional Interest, if any, on a Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder."

Section 6.07 tracks section 316 (b) of the Trust Indenture Act of 1939 (TIA) (*see* 15 USC § 77ppp [b]). The Indenture was not qualified under the TIA, meaning that it was not an indenture that governed securities registered with the Securities and Exchange Commission (*see* 15 USC § 77iii [a]). Nevertheless, in addition to restating some of the statutory language, the Indenture incorporated by reference "[a]ny provision of the TIA which is required to be included in a qualified indenture."

Remedies in the event of default are set out in the Indenture Documents, and the Trustee is authorized to take any available remedial action, including remedies available under the Uniform Commercial Code (UCC) (*see* sections 6.03 and 12.08 of the Indenture; section 9.1 [viii] of the Security Agreement; section 3.1 [a] [4] of the Collateral Trust Agreement). In addition to empowering the Trustee with this broad authority, section 6.05 of the Indenture, titled "Control by Majority," provides that "the Holders of a majority in principal amount of the outstanding Notes may direct the time, method and place of

conducting any proceeding for exercising any remedy available to the Trustee." Section 6.05 tracks section 316 (a) of the TIA (*see* 15 USC § 77ppp [a]).

As the date for the payment of principal approached, and Cleveland Unlimited's financial situation deteriorated, the interplay among the provisions governing the Noteholders' rights and remedies took on practical significance.

Cleveland Unlimited Defaults

Interest payments on the Notes were made, as scheduled, up to September 2010. In early December of that year, however, Cleveland Unlimited determined that it would not be able to pay the outstanding principal and interest shortly to come due. Seeking to avoid an event of default, Cleveland Unlimited entered into negotiations regarding potential workouts with the Trustee and a committee of Noteholders that owned over 99% of the outstanding principal value of the Notes, including the Minority Noteholders and a separate group that owned 96.3% (Majority Noteholders).[3]

Despite those efforts, on December 15, 2010, Cleveland Unlimited defaulted on its obligation to pay the outstanding principal and interest now due. Discussions regarding potential restructuring transactions continued post-default. Several weeks later, the same committee executed a "Forbearance Agreement" with Cleveland Unlimited, the Guarantors, the Trustee, and CUI Holdings, LLC (CUI Holdings), an affiliate of Cleveland Unlimited that owned 100% of its stock. Pursuant to this agreement, CUI Holdings became

---

[3] "A workout is simply a contractually concluded modification of debt effected either by amendment of the terms of the existing debt or an exchange of the existing debt for new obligations" (William W. Bratton & Adam J. Levitin, *The New Bond Workouts*, 166 U Pa L Rev 1597, 1604 [2018]).

a Guarantor on the Notes, pledging the Cleveland Unlimited stock as collateral, and the Noteholders and the Trustee agreed to refrain from exercising any rights or remedies available to them through April 2011.

On the same day that the Forbearance Agreement was executed, CUI Holdings and a new entity owned by the Majority Noteholders, CUI Acquisition Corp. (CUI Acquisition), negotiated a "Purchase and Sale Agreement." Pursuant to this agreement, CUI holdings would transfer all outstanding stock in Cleveland Unlimited to CUI Acquisition for the benefit of the Noteholders. In return, the Noteholders would forfeit their rights as secured creditors and, instead, become equity holders in Cleveland Unlimited, thereby relieving Cleveland Unlimited and the Guarantors of their obligations under the Notes. In April 2011, the Minority Noteholders informed the Majority Noteholders that they did not plan to participate in the Purchase and Sale Agreement, opting to remain secured Noteholders and seek full payment on the Notes. The Purchase and Sale Agreement failed to close by the end of the Forbearance Period.

The Strict Foreclosure

In June 2011, counsel for the Majority Noteholders informed all Noteholders that it had been "working with" the Trustee on an alternative restructuring transaction, namely a "strict foreclosure" pursuant to sections 9-620 and 9-622 of the model UCC (*see* NY UCC §§ 9-620; 9-622). According to counsel, this transaction "would enable [them] to maintain the structure of the [Purchase and Sale Agreement] . . . without requiring consent from all

of the [H]olders."[4]  Instead of reaching an agreement among all the Noteholders, the Trustee, at the direction of the Majority Noteholders, would "foreclose strictly" on the collateral that CUI Holdings had pledged against the Notes—100% of the outstanding stock in Cleveland Unlimited—and then distribute the stock on a pro-rata basis to the Noteholders, thereby cancelling the Notes and ending the obligations of Cleveland Unlimited and the Guarantors under the Indenture.

The Minority Noteholders, in a letter sent to Cleveland Unlimited, the Majority Noteholders, and the Trustee, asserted that they did not "join or in any way consent to the [strict foreclosure]."  The letter explained that, "pursuant to [s]ection 6.07 of the Indenture and relevant sections of the [TIA]," the Minority Noteholders did not "consent to any impairment or effect on their rights to receive payment of principal or interest" on their Notes, "on or after the respective due dates, or to bring suit for the enforcement of any such payment on or after such respective dates."

Over the Minority Noteholders' objection, the strict foreclosure went forward.  As the first step, the Majority Noteholders and the Trustee entered into a "Majority Noteholder Direction and Indemnity Agreement," in which the Majority Noteholders "directed" the Trustee to "foreclose strictly" on the Cleveland Unlimited stock owned by CUI Holdings, "thereby extinguishing the indebtedness evidenced by the Notes."[5]  The Trustee complied

---

[4] Counsel's email indicates that the workout contemplated an additional loan to Cleveland Unlimited in the amount of $35 million.  After the strict foreclosure, a senior secured loan in a similar amount was made by certain Majority Noteholders.

[5] A secured party may accept collateral in full or partial satisfaction of the obligation (*see* UCC § 9-620 [a]).  In a full strict foreclosure, the secured party retains the collateral in full satisfaction of the remaining debt, foreclosing any deficiency claim (*see* UCC § 9-622 [a]

with the Majority Noteholders' direction and, in turn, executed a "Strict Foreclosure Agreement," pursuant to which CUI Holdings transferred its 100% equity stake in Cleveland Unlimited to the Trustee for the benefit of the Noteholders. The Strict Foreclosure Agreement specified that the Trustee's acceptance of the stock constituted a "full and final payment and satisfaction of" Cleveland Unlimited's "indebtedness evidenced by the Indenture [and] the Notes."

On the same day as the execution of the strict foreclosure, the Trustee advised all Noteholders that the Majority Noteholders had "directed" the "Trustee to foreclose strictly on the Cleveland [Unlimited] stock in full satisfaction of the Notes" and to distribute the stock to all Noteholders on a pro-rata basis. The Trustee further advised the Noteholders of the legal effect of the strict foreclosure, specifically that:

> "[B]y operation of law as a result of the strict foreclosure, the indebtedness evidenced by the Notes shall be deemed paid and cancelled and with limited exceptions, the obligations of [Cleveland Unlimited] under the Indenture shall be terminated. The rights of Holders will be limited to receiving the pro rata share of the aforementioned distribution [of Cleveland Unlimited stock] and no further distributions will be made to Holders on account of the Notes."

The Trustee subsequently distributed the Cleveland Unlimited stock on a pro-rata basis to the Majority and Minority Noteholders.

---

[1] and comment 2; *In re CBGB Holdings, LLC*, 439 BR 551, 555 [SD NY 2010]). In a partial strict foreclosure, the creditor retains the collateral, forgives part of the debt owed by the debtor, and sues the debtor for deficiency (*see* UCC § 9-622 [a] [1] and comment 2). In either case, the consent of the debtor and other secured creditors is required (*see* UCC § 9-620 [a]-[b]).

Shortly after the strict foreclosure, a majority of the Majority Noteholders made a $34 million senior secured loan to Cleveland Unlimited at a 10% interest rate. When Cleveland Unlimited was subsequently liquidated, the proceeds were used to pay that group of secured lenders the principal and outstanding interest owed on the loan. Ultimately, Cleveland Unlimited distributed approximately $13.5 million to its shareholders, but withheld any distribution to the Minority Noteholders pending resolution of this litigation.

The Minority Noteholders' Suit for Payment

Plaintiffs, the Minority Noteholders, commenced this action for breach of contract and breach of guaranty against Cleveland Unlimited and the Guarantors, now including CUI Holdings (collectively, defendants), for payment of principal and interest on the Notes, contending that, because they had not consented to the transaction, their right to payment and interest, and their right to bring suit to enforce those payment rights, had been impermissibly terminated. Defendants countered that plaintiffs' rights under the notes were extinguished by operation of the strict foreclosure, an enforcement mechanism expressly authorized by the terms of the Indenture Documents. Both parties moved for summary judgment. Supreme Court denied the Minority Noteholders' motion, and granted defendants' motion, dismissing the complaint. The court held that several provisions in the Indenture Documents, when read together, evidenced a "collective design" that authorized the Trustee "to act for all the [N]oteholders in the event of [Cleveland Unlimited]'s default, upon the direction of the [Majority Noteholders]." Accordingly, the court held that the strict foreclosure was permissible under the parties' agreement, relying on this Court's decision in *Beal Sav. Bank v Sommer* (8 NY3d 318 [2007]). Further, citing

*Marblegate Asset Mgt., LLC v Education Mgt. Fin. Corp*. (846 F3d 1 [2d Cir 2017]), the court held that the strict foreclosure did not violate section 316 (b) of the TIA—or the equivalent language of section 6.07 of the Indenture—because that transaction neither formally "amend[ed] any terms of the Indenture" nor "prevent[ed the Minority Noteholders] from bringing an action to collect payments due on the dates indicated in the Indenture." Despite granting summary judgment to defendants and dismissing the complaint, the court concluded that the Minority Noteholders "retain[ed] the legal right to obtain payment by suing Cleveland Unlimited as the issuer of the original [N]otes."

The Appellate Division affirmed based on much of the same rationale, holding that "[a] fair reading of the [Indenture Documents] demonstrates that the [Trustee] was authorized to pursue default remedies, including the strict foreclosure at issue here, if so directed by a majority of noteholders" (162 AD3d 573, 573 [1st Dept 2018]). The Appellate Division held that section 6.07 of the Indenture did not supersede, nor conflict with, the sections of the Indenture Documents that authorized the Trustee to take those remedies; rather, section 6.07 of the Indenture, "which tracks the language of" section 316 (b) of the TIA, "'prohibits only non-consensual amendments to an indenture's core payment terms'" (*id.* at 573-574, quoting *Marblegate*, 846 F3d at 3). The strict foreclosure, the Appellate Division concluded, "did not amend the core payment terms in violation of section 6.07 of the Indenture, even if it had a similar effect" (*id.* [internal quotation marks omitted]).

This Court granted plaintiffs leave to appeal (32 NY3d 914 [2019]).

<u>Analysis</u>

In order to determine whether plaintiffs may proceed against defendants in this action to recover outstanding principal and interest on the Notes, we must examine whether plaintiffs' payment rights were, in fact, extinguished by the strict foreclosure, which purportedly cancelled their Notes. As specified in the agreement between the parties to the Indenture Documents, New York law controls (*see* section 11.7 of the Indenture). Our case law makes clear that we approach the interpretation of the Indenture provisions as a matter of basic contract law (*see Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 39 [2018]; *Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 NY3d 549, 559 [2014]). If an indenture "'is complete, clear and unambiguous on its face,'" it "'must be enforced according to the plain meaning of its terms'" (*Cortlandt*, 31 NY3d at 39, quoting *Quadrant*, 23 NY3d at 559-560). When reviewing an indenture, "particular words should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties manifested thereby" (*Kolbe v Tibbetts*, 22 NY3d 344, 353 [2013] [internal quotation marks and brackets omitted]). Applying these principles of contract interpretation, we turn to the language of the Indenture provision underlying the dispute between the parties.

Section 6.07 provides that, "[n]otwithstanding" any other provision in the Indenture, the rights of a Noteholder to "receive payment" of principal and interest on the Notes, and to "bring suit for the enforcement of any such payment . . . , shall not be impaired or affected without the consent of such Holder." Plaintiffs argue that the plain terms of this section prohibited the strict foreclosure from having the effect of extinguishing their legal rights to payment and to bring suit. Defendants maintain that the meaning of "impaired or affected"

is ambiguous and cannot be read to cover the effect of the strict foreclosure, because those terms relate to only formal amendments to the core payment terms of the Indenture.

Although the Indenture is governed by New York law and is not qualified under the TIA, sections 6.05 and 6.07 of the Indenture incorporate language from subsections (a) and (b) of section 316 of the TIA, respectively. Therefore, we may look to the TIA for guidance as to the intended application of those Indenture provisions (*see Racepoint Partners, LLC v JPMorgan Chase Bank, N.A.*, 14 NY3d 419, 423 [2010] [parties' intent in the indenture provision may be equated with congressional intent with respect to the relevant section of the TIA]; *see generally* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum L Rev 527, 537 [1947] ["if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it"]). In interpreting sections 6.05 and 6.07, we look to the structure and design of the corresponding TIA provisions (*see Nadkos, Inc. v Preferred Contrs. Ins. Co. Risk Retention Group LLC*, 34 NY3d 1, 9-10 [2019]).[6]

As the title of section 316 of the TIA announces, the provision covers "[d]irections and waivers by bondholders" and the "prohibition of impairment of holder's right to payment" (15 USC § 77ppp). The topics are not unrelated. Subsection (a) permits a qualified indenture to contain certain "majority action" or "collective action" clauses

---

[6] It seems, at best, inconsistent to argue, as the dissent does, that our opinion inappropriately "elevates the importance of the [TIA] . . . to a place of undue prominence in determining this case" (dissenting op at 2; *see* dissenting op at 12 ["the TIA does not have charge of this review"]), while at the same time lamenting that our opinion "strikes at the consistency between" the law of this Court and federal law (dissenting op at 2; *see* dissenting op at 13-15).

authorizing a majority in principal amount of the securities to: (1) "direct the time, method, and place for conducting any proceeding for any remedy available to such trustee"; and (2) "consent to the waiver of any past default and its consequences" on behalf of all security holders (15 USC § 77ppp [a] [1]).  A separate part of subsection (a) states that an indenture may contain a provision permitting the holders of at least 75% in principal amount of the indenture securities "to consent on behalf of the holders of all such indenture securities to the postponement of any interest payment for a period not exceeding three years from its due date" (15 USC § 77ppp [a] [2]).

Subsection (b), which is mandatory in all indentures governed by the TIA, serves as a limitation on the majority action authorized in subsection (a).  The only exception to the blanket rule in subsection (b) is the ability of 75% of the security holders to postpone interest for a limited period of time provided for in subsection (a) (2) (*see* 15 USC § 77ppp [b]; *Marblegate*, 846 F3d at 14).  Accordingly, the other types of majority action permitted by subsection (a), namely the authority to excuse a default and to direct trustee action in the event of a default, are constrained by subsection (b) (*see Kimmel v State*, 29 NY3d 386, 394 [2017], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 240 at 412-413 ["'where a statute creates provisos or exceptions as to certain matters(,) the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned'"]; *see e.g. Continental Bank & Trust Co. of N.Y. v First Natl. Petroleum Trust*, 67 F Supp 859, 871 [D RI 1946] [holding that, despite the unconditional language in subsection (a) permitting a majority of bondholders "to consent to the waiver of any past default," an attempt by a majority group of bondholders to postpone or waive a default of

an interest payment was nevertheless "directly contrary to the provisions of the (TIA) expressly prohibiting impairment of the right of a debenture holder to receive payment"]). Majority action with respect to remedies must be similarly constrained (*see In re Board of Directors of Telecom Argentina, S.A.*, 528 F3d 162, 172 [2d Cir 2008] [recognizing that section 316 (b) of the TIA "protects the holder of a bond issued under a qualified indenture from majority-imposed impairment of its rights"]; George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am Bankr Inst L Rev 431, 433 [2006] ["section 316(b) protects the rights of each individual bondholder under an indenture as against other bondholders under that indenture"]).  Indeed, the structure of the TIA demonstrates an intent to protect bondholders' legal rights to payment and to bring suit from the effects of collective action.  The Majority Noteholders were empowered to act, without the consent of all Noteholders, in directing a specific remedy—the strict foreclosure—and the Trustee was authorized to follow that directive.  However, the purported cancellation of the Notes cannot extinguish the rights protected by section 6.07 of the Indenture.

The dissent instead frames the issue as "whether the trustee was authorized to proceed with the strict foreclosure" (dissenting op at 6; *see also* dissenting op at 17 ["For an undisclosed reason, plaintiffs here chose not to sue the trustee for breach of its duties"]). There is no question that, here, the Trustee was authorized to act.  The issue is whether the Minority Noteholders' rights were extinguished—not "impair[ed]" (dissenting op at 17)— by the purported cancellation of the Notes.  A similar disconnect from the issue in this case leads the dissent to mine lengthy block quotes from the legislative history of the Barkley

Bill, an earlier version of what became the TIA, concerning the *authorization* of a trustee to act at the direction of a majority of bondholders (*see* dissenting op at 16-17, citing The Regulation of the Sale of Certain Securities in Interstate and Foreign Commerce, and the Trust Indentures Under Which the Same are Issued, and for Other Purposes: Hearing on S. 2344 Before a Subcommittee of the Committee on Banking and Currency, 75th Cong. 48, 66-67 [1937] [statement of William O. Douglas, Commissioner, Securities and Exchange Commission] [hereinafter S. 2344]).   The discussion concerning the percentage of bondholders that could compel the trustee to act took place in the context of a bill that would have vested the Securities and Exchange Commission (SEC) with broad discretion to approve indenture terms (*see* Talcott M. Banks, Jr., *Indenture Securities and the Barkley Bill*, 48 Yale L J 533, 563 [1939] ["the Commission's power to create indenture clauses appears to be altogether unlimited"]).  Commissioner William O. Douglas was addressing the concern that the SEC would qualify an indenture that contained a provision requiring 100% of the bondholders to authorize the trustee to take any specific course of action (*see* S. 2344 at 48).  As enacted, the TIA provides that, unless otherwise expressly excluded, the indenture will be deemed to include a provision permitting a simple majority in principal amount of the securities to authorize the trustee to pursue an available remedy. In the same section of the TIA, however, certain core rights of minority bondholders are protected (*see Marblegate*, 846 F3d at 15 n 15 ["while the 1938 version of the bill vested

discretion in the SEC to regulate indenture provisions, the 1939 version of the bill was altered to mandate that all qualified indenture contain certain provisions"]).[7]

Defendants maintain that, despite the language of the statute, cancellation of the Notes by majority action authorized in subsection (a) of section 316 of the TIA does not violate the rights protected by subsection (b), relying on language in *Marblegate* that they claim limits the scope of subsection (b) to protection against "formal amendments" of "core payment terms" (*see* 846 F3d at 7, 14-15). The strict foreclosure, defendants argue, did not effectuate such an amendment, and thus was not prohibited by subsection (b). Plaintiffs assert that *Marblegate*, when read correctly, supports their argument that the strict foreclosure could not be used to extinguish their rights to sue Cleveland Unlimited, the Issuer—an entity that "remained intact with all its operating assets." Plaintiffs are correct.

The *Marblegate* decision addressed a theory of recovery, adopted in a series of district court cases, which expanded the concept of impairment of the right to payment under section 316 (b) of the TIA to include limitations on a bondholder's "practical ability" to collect (*see e.g. BOKF, N.A. v Caesars Entertainment Corp.*, 144 F Supp 3d 459, 467-

---

[7] In the early drafts of the TIA, the language empowering majority bondholders to "direct the method and place of conducting all proceedings at law or in equity for any remedy under [the] indenture" appeared in the section detailing the duties of the trustee in the event of default, rather than the section on majority action and bondholders' rights (*see* Trust Indentures: Hearings on H.R. 10292 Before the Subcommittee of the House Committee on Interstate & Foreign Commerce, 75th Congress, 11-13 [1938]; Trust Indentures: Hearings on H.R. 2191 & H.R. 5220 Before the Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Congress, 11-14 [1939] [hereinafter H.R. 2191 & H.R. 5220]). At some point prior to the passage of the TIA, however, that language was incorporated into what became section 316 (*see* 15 USC § 77ppp [a]; H.R. 2191 & H.R. 5220 at 30-31).

468, 474-477 [SD NY 2015]; *MeehanCombs Global Credit Opportunities Funds, LP v Caesars Entertainment Corp.*, 80 F Supp 3d 507, 509 [SD NY 2015]; *see generally Cummings v Chesapeake Energy Corp.*, 2017 WL 3836112, *2-5 [WD Ok, Feb. 8, 2017, NO. CIV-16-00647-HE]).  The minority bondholder in *Marblegate* asserted that section 316 (b) demonstrated "Congress's broad intent to prohibit an out-of-court restructuring that has the purpose and effect of eliminating *any* possibility of receiving payment under their notes," a view effectively adopted by the district court (846 F3d at 8 [emphasis in original] [internal quotation marks omitted]).  The Second Circuit, after a detailed examination of the transaction at issue and the resulting impact on minority payment rights, rejected that expansive reading of the statute (*see id.* at 8-17; *see also* Bratton & Levitin, *The New Bond Workouts*, 166 U Pa L Rev at 1649-1655 [describing "The Rise and Fall of the Broad Reading of (s)ection 316(b)"]).

The issuer in *Marblegate* had two layers of debt, secured and unsecured (*see* 846 F3d at 3).  Upon default, the secured creditors became the exclusive owners of the collateral, consisting of virtually all the issuer's assets (*see id.* at 3-4).  After failing to get unanimous creditor consent for a voluntary workout plan, an "Intercompany Sale" was initiated, pursuant to which the secured creditors would "first exercise their preexisting rights under the [at-issue credit agreement] and Article 9 of the [UCC] to . . . foreclose on [the issuer]'s assets" (*id.* at 4).  That action would serve to release a parent guarantee under both the secured and unsecured debt (*see id.*).  The secured creditors then consented to the sale of the foreclosed assets to a newly-created subsidiary of the issuer, which would distribute debt and equity to only the consenting creditors (*see id.*).  The plaintiff, a minority

holder of unsecured notes, did not consent and sued to enjoin the Intercompany Sale on the ground that it violated section 316 (b) of the TIA because it impaired the practical ability to recover on the debt (*see id.* at 5). The Second Circuit held that section 316 (b) was not violated because the plaintiff "retain[ed] its legal right to obtain payment by suing [the issuer], among others" (*id.* at 17). Absent changes to "core payments terms," the Second Circuit explained, the plaintiff could not "invoke [s]ection 316(b) to retain an absolute and unconditional right to payment of its notes" (*id.* [internal quotations marks omitted]).

As an initial matter, the phrase "changes to the core payment terms" in *Marblegate* was used to describe the right to payment of principal and interest protected in section 316 (b) of the TIA; it was not relevant to the right to bring suit (*see id.* at 7; *see also Upic & Co. v Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 454-455 [SDNY 1992]). The plaintiff's unimpaired right to bring suit—also protected by section 316 (b)—was crucial to *Marblegate*'s holding that there was no violation of section 316 (b) (*see* 846 F3d at 16-17; *see also Cummings*, 2017 WL 3836112 at *5 [noting that, in *Marblegate*, the Second Circuit "concluded that as long as a bondholder retains the legal right to obtain payment by suing . . . , the holder cannot invoke (s)ection 316(b) to retain an absolute and unconditional right to payment of its notes" (internal quotation marks omitted)]). As the *Marblegate* Court noted, with the plaintiff's right to bring suit unaffected by the out-of-court reorganization, section 316 (b) had not been violated because the plaintiff could pursue claims against the issuer and others (*see* 846 F3d at 16-17).

The plaintiff in *Marblegate* needed to rely on a theory of interference with its "practical ability"—not its legal right—to receive payment (*id.* at 2, 5, 7). After all, the

restructuring transaction left the issuer intact, thereby preserving the plaintiff's legal rights to sue the issuer and to receive payment, but making any chance of recovery remote.[8]  With that right to bring suit intact, the Second Circuit expressly rejected the notion that section 316 (b) of the TIA protects a noteholder's "practical ability" to recover payment in full and, instead, concluded that the provision was not violated by the transaction at issue (*see id.* at 17).  Here, unlike in *Marblegate*, a minority holder of unsecured debt did not merely lose the "practical ability to collect payment" by virtue of a foreclosure accomplished by secured creditors (*id.* at 2).  Rather, at the direction of the Majority Noteholders, the Trustee initiated a strict foreclosure that, while leaving the intact issuer with its operating assets, cancelled the Notes, terminating the Minority Noteholders' *legal* right to receive payment of principal and interest on the Notes (*see* Brief of the Law Professors as Amicus Curiae in Support of Motion to Appeal: 7).

Defendants also argue that plaintiffs' rights were not violated because the transaction was authorized by section 6.05 of the Indenture, which empowers the Majority Noteholders to "direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee," including a strict foreclosure under the UCC.  Because section 6.07 applies "[n]otwithstanding any other provision in this Indenture[,]" however, the powers conferred upon the Majority Noteholders by section

---

[8] The minority bondholder in *Marblegate* was an unsecured junior creditor whose only guarantee was a "tag along," meaning "the guaranty had been created in connection with the [senior secured] loan and could be terminated at the [senior secured creditor]'s option" (Bratton & Levitin, *The New Bond Workouts*, 166 U Pa L Rev at 1651 [internal quotation marks omitted]; *see Marblegate*, 846 F3d at 3-4).  Plaintiffs in this case, by contrast, are senior secured creditors with numerous guarantors securing the obligation.

6.05 are subject to the limitations in section 6.07. When a preposition such as "notwithstanding any other provision" is included in a contractual provision, that provision overrides any conflicting provisions in the contract (*see Beardslee v Inflection Energy, LLC*, 25 NY3d 150, 158 [2015]; *accord Cisneros v Alpine Ridge Group*, 508 US 10, 18 [1993] ["the use of . . . a 'notwithstanding' clause clearly signals the drafter's intention that the provision of the 'notwithstanding' section override conflicting provisions of any other section"]). Therefore, the powers granted to the Majority Noteholders in section 6.05 cannot be used to extinguish the legal right to sue or the legal right to payment of non-consenting Noteholders protected in section 6.07.

The dissent agrees, recognizing that section 6.07 of the Indenture, "which demand[s] the consent of each noteholder as a predicate to an action of the trustee that would impair or affect" the rights afforded to such Noteholder under that section, overrides any conflicting Indenture provision (dissenting op at 7-8). Nevertheless, the dissent argues that the strict foreclosure was authorized by the Collateral Trust Agreement, namely section 3.3, which allows the Trustee, at the direction of a group of majority Noteholders, to take remedial action in the event of a default (dissenting op at 8-9). According to the dissent, this "adjustment of the indenture by operation of the collateral trust agreement provided the consent of the minority noteholders required in the indenture" (dissenting op at 10).

The Noteholders are not parties to the Collateral Trust Agreement, notwithstanding the dissent's suggestion to the contrary (*see* dissenting op at 12 [referring to "the consent given by the noteholders through the collateral trust agreement"]). Rather, the Noteholders' consent to the terms of the Collateral Trust Agreement is found in the

provisions of the Indenture.   Section 12.01 (b) of the Indenture provides that the Noteholders "consent[] and agree[] to the terms of" the Collateral Trust Agreement and "authorize[]" the Trustee "to perform its obligations and exercise its rights hereunder and thereunder in accordance herewith and therewith."   Relatedly, section 12.08 of the Indenture, titled "Authorization of Actions to be Taken by the Collateral Trustee under the Security Documents," provides that the Noteholders "agree[] that the Trustee "may, in its sole discretion and without the consent of the . . . Holders, take all actions it deems necessary or appropriate in order to . . . enforce any of the terms of the . . . Collateral Trust Agreement."   The only authorization—or consent—for the Collateral Trustee to act on behalf of the Noteholders is found in the Indenture, and, as with any other Indenture provision, the authority granted in Article Twelve must yield to the "[n]otwithstanding" clause in section 6.07.[9]

Defendants' reliance on a "collective design" theory, and their use of this Court's decision in *Beal* in support of this argument, is likewise unavailing (*see also* dissenting op at 10-11).  In *Beal*, because the credit agreement lacked an "explicit provision stating that a Lender may—or may not—take individual action in the event of a default," it was necessary to "look to other specific clauses and the agreements as a whole to ascertain the

---

[9] The dissent references section 9.1 (viii) of the Security Agreement, stating that, "[t]o the extent it is relevant here," it "endows the trustee with the remedial power to, among other things, exercise in respect of the collateral all rights and remedies of a secured party on a default under the UCC" (dissenting op at 11 n 4).  Section 11.1 (a) of the Security Agreement, however, states that the actions of the Trustee "are subject to the provisions of the Indenture."   Accordingly, the power conferred upon the Trustee by the Security Agreement is "subject to" the limitations imposed by section 6.07 of the Indenture.

parties' intent" (*Beal*, 8 NY3d at 326).   We determined that the agreements had "an unequivocal collective design" (*id.*), indicating that "the lenders intended to act collectively" and "to preclude an individual lender from disrupting the scheme of the agreements at issue" (*id.* at 321).   Accordingly, this Court concluded that the parties had no intention to create an individual right of action (*see id.* at 328).

In stark contrast to the agreement at issue in *Beal*, the Indenture in this case contained a specific provision, section 6.07, that affords each individual Noteholder the absolute legal right to bring suit on its own behalf for payment of principal or interest, despite any "no-action clause" to the contrary (*see Cruden v Bank of N.Y.*, 957 F2d 961, 968 [2d Cir 1992]; *see also Marblegate*, 846 F3d at 7).   Further, the Indenture contained another provision, section 6.06, which explicitly prescribes a Noteholder's right to sue. Sections 6.06 and 6.07, therefore, answer the question that the operative documents in *Beal* did not—an individual Noteholder's legal right to sue for payment of principal and interest may not be impaired or affected without such Noteholder's consent, notwithstanding any other provision in the Indenture, including those contained in Article Twelve related to the Collateral Trust Agreement.

We hold, consistent with the language, structure, and organization of the relevant Indenture provisions and the TIA, that, under the circumstances here, the purported cancellation of the Notes without the dissenting Minority Noteholders' consent violated section 6.07 of the Indenture.   Because we reject defendants' only defense on liability— the claim that any legal rights plaintiffs had to payment on the debt had been extinguished by the strict foreclosure, which purportedly cancelled their Notes without their consent—

plaintiffs were entitled to partial summary judgment.  Although plaintiffs argue they are entitled to an award equal to the face value of the Notes plus unpaid interest, defendants contend that, even if a breach occurred, a trial is needed on damages, and, therefore, the appropriate course would be to remit to Supreme Court, with the caveat that the claims against one of the guarantors, CUI Holdings—the owner of the collateral subject to the strict foreclosure—should be dismissed.  These arguments, among others preserved by the parties, raise questions of law and fact that should be addressed in the first instance by Supreme Court upon remittal (*see generally Sasso v Vacharis*, 66 NY2d 28, 37 [1985]).

Accordingly, the order of the Appellate Division should be modified, without costs, by denying defendants' motion for summary judgment, and granting partial summary judgment to plaintiffs, in accordance with this opinion.

FAHEY, J. (dissenting):

This decision needlessly disconnects the law of the two courts most relevant to the markets in which these securities are traded.  Confusion will surely follow.

The majority opinion begins with what is presented as a relatively benign conclusion: "plaintiffs' right to sue for payment on the notes survived a strict foreclosure, undertaken by the trustee at the direction of a group of majority bondholders over plaintiffs' objection, that purported to cancel the notes" (majority op at 1-2). Lurking beneath that faulty premise is an alarming notion.

The majority strikes at the consistency between the law of this Court and that of the United States Court of Appeals for the Second Circuit with respect to the rules by which disputes related to an indenture of this nature are to be resolved. This matter is one that should be governed by basic principles of contract interpretation, and here there are two agreements that, when properly read as one, govern that review: the indenture, for which the majority accounts, and the collateral trust agreement, which the majority does not meaningfully consider. Those agreements were executed simultaneously and, when read together, they support the strict foreclosure course chosen by the trustee following the default of defendant Cleveland Unlimited, Inc. (Cleveland Unlimited) with respect to the notes in question.

The majority, however, brushes the collateral trust agreement aside. At the expense of both our rules of contract interpretation and the symmetry of such principles with those of the Second Circuit, the majority elevates the importance of the Trust Indenture Act of 1939 (TIA) (*see* 15 USC § 77aaa) to a place of undue prominence in determining this case.

Certainty of the law is an essential underpinning of financial dealings such as this one. The prudent, common-sense approach here would be to maintain that sureness and to avoid creating space between the rules of this Court and the rules of the Second Circuit

governing the interpretation of indenture agreements. We should conclude that our steady rules of contract interpretation applied to the plain language of the contract in question authorize the strict foreclosure here at issue. For those reasons, we respectfully dissent and would affirm the Appellate Division order.

I.

A.

In 2005, Cleveland Unlimited, a wireless communications provider based in Ohio, issued $150 million in senior security notes guaranteed by 18 entities that are defendants in this matter. The issuance of those notes was accomplished in part through the indenture, which named U.S. Bank National Association (U.S. Bank) as the trustee and addressed the remedies available in the event of a default.

"An indenture agreement is essentially a written agreement that bestows legal title of the securities in a single Trustee to protect the interests of individual investors who may be numerous or unknown to each other" (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 NY3d 549, 555 [2014]; *see Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 39 [2018]). The indenture "identifies the rights of all parties concerned, as well as the duties of the trustee (a third-party administrator), the obligations of the borrower, and the remedies available to the investors" (*Quadrant Structured Prods. Co.*, 23 NY3d at 555 [internal quotation marks omitted]).

Said more simply, an indenture is a contract, absent which investors in a distressed security covered by such a compact likely would race to protect their individual interests, potentially through majority action to force a sale that might harm minority stakeholders.

That is, an indenture is a way of establishing equality and stability among investors. It acts to prevent the chaos that would follow should each investor be free to pursue its own interests with respect to the covered investment.

In this case the indenture is one of two agreements of primary concern. The indenture and the collateral trust agreement were executed contemporaneously. The collateral trust agreement was contemplated in the indenture. It modified the powers granted to U.S. Bank through the indenture so as to allow U.S. Bank to act as directed by the majority of noteholders in realization of the collateral in the event of a default.

### B.

In January 2008, Moody's Investor Services downgraded the notes and judged them to be of high credit risk. Still, in April 2010, plaintiffs purchased on the secondary market $5 million in notes, or approximately 3.33% of the outstanding principal amount of $150 million.

Shortly before the notes were to mature in December 2010, Cleveland Unlimited recognized that it would not be able to pay the outstanding principal and interest on those instruments. That financial distress prompted negotiations involving Cleveland Unlimited, U.S. Bank, and an ad hoc committee of noteholders that owned over 99% of the outstanding principal value of the notes. Those efforts failed. Cleveland Unlimited subsequently defaulted on its obligations under the notes.

Following that default, a group that owned 96.3% of the outstanding notes (hereafter, the majority noteholders) instructed the trustee to exercise a strict foreclosure[1] on the collateral that had been pledged to secure the notes, which consisted of stock in Cleveland Unlimited. Plaintiffs—the minority noteholders—made no effort to enjoin the proceeding, voiced their opposition to the transaction, and maintained that section 6.07 of the indenture prohibited the foreclosure absent their consent. That stock then was transferred to U.S. Bank and distributed to the minority noteholders, as well as to a holding company (CUI Acquisition Corp.) created for the benefit of the majority noteholders.

That strict foreclosure prompted this action, in which plaintiffs, among other things, contended that section 6.07 of the indenture prevented defendants from denying them payment under the notes without their consent. The lower courts disagreed, concluding that the indenture and the collateral trust agreement permitted the pursuit of the strict foreclosure here in question (*see CNH Diversified Opportunities Master Account, L.P. v Cleveland Unlimited, Inc.*, 162 AD3d 573, 573 [1st Dept 2018]). We granted plaintiffs leave to appeal (32 NY3d 914 [2019]).

II.

---

[1] "Strict foreclosure" is an industry name for the remedy afforded secured creditors pursuant to UCC 9-620 and UCC 9-622. Through that remedy, the secured creditor accepts the debtor's pledged collateral in satisfaction of the obligation that the collateral was to secure (*see* Phillip J. Hendell, *The Friendly Foreclosure*, 16 Com L Bull 16 [2001]). The "strict foreclosure" remedy is to be distinguished from a bankruptcy proceeding, which generally considers either the adjustment or the liquidation of a debtor's assets in satisfaction of an unsatisfied obligation.

We turn to the question whether the trustee was authorized to proceed with the strict foreclosure and, in doing so, to defeat the ability of the minority noteholders to seek an independent means of recompense with respect to the notes.  That analysis, as the majority notes (*see* majority op at 10), should be governed by our basic rules of contract interpretation (*see Cortlandt St. Recovery Corp.*, 31 NY3d at 39; *Quadrant Structured Prods. Co., Ltd.*, 23 NY3d at 559).  The analysis also proceeds under the rule that where, as here, multiple agreements are executed at substantially the same time and related to the same subject matter, we will regard those contemporaneous writings as one and read them together (*see Nau v Vulcan Rail & Constr. Co.*, 286 NY 188, 197 [1941] [three instruments "executed at substantially the same time, (and) related to the same subject-matter, . . . must be read together as one . . . (s)ince they were to effectuate the same purpose and formed a part of the same transaction"]; *see generally TVT Records v The Is. Def Jam Music Group*, 412 F3d 82, 89 [2d Cir 2005] ["Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose (must) be read together, even (if) they were executed on different dates and were not all between the same parties"] [internal quotation marks omitted]).

### A.

Under section 6.03 of the indenture, the indenture trustee—U.S. Bank—was authorized to "pursue any available remedy by proceeding at law or in equity to collect payment" on behalf of the holders in the event of a default.  That is, under that part of the indenture, U.S. Bank, as the indenture trustee, was empowered to take any legal action on behalf of the noteholders necessary to make them whole in the event of a default.

Under section 6.05 of the indenture, such action by the trustee was to be prompted by authorization of a majority of the noteholders.  That section, entitled "Control by Majority," specifically provides that,

> "[s]ubject to any applicable law, the [h]olders of a majority in principal amount of the outstanding [n]otes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the [indenture] [t]rustee or the [c]ollateral [t]rustee . . . including, without limitation, any remedies provided for in Section 6.03."

Under Section 6.07 of the indenture, the right of the indenture trustee or the collateral trustee—U.S. Bank has both roles—to enforce a payment obligation on an outstanding note arguably is limited.  That part of the indenture provides that,

> "[n]otwithstanding any other provision of [the] [i]ndenture, the right of any [h]older to receive payment of principal of, premium, if any, and interest and [a]dditional [i]nterest, if any, on a [n]ote, on or after the respective due dates expressed in such [n]ote, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected *without the consent of such [h]older*" (emphasis added).

" '[U]nder New York Law, clauses similar to the phrase "[n]otwithstanding any other provision" trump *conflicting* contract terms' " (*Beardslee v Inflection Energy, LLC*, 25 NY3d 150, 158 [2015], quoting *Bank of N.Y. v First Millennium, Inc.*, 607 F3d 905, 917 [2d Cir 2010] [emphasis added]).  Consequently, to the extent there is a conflict between the combined force of sections 6.03 and 6.05 of the indenture (which empower the trustees to take any steps authorized by majority noteholders to collect payment on behalf of those holders in the event of a default) and the requirements of section 6.07 of that compact (which demand the consent of each noteholder as a predicate to an action of the trustee that

would impair or affect the right of the holder to receive payment of, among other things, principal outstanding on the note), the latter section would control.  Absent the consent of the minority noteholders, and standing alone, that latter section would prohibit the trustee from pursuing the strict foreclosure in question here.

B.

The indenture, however, is not a lonely compact and it cannot be read in a vacuum. To do so would be to disregard the collateral trust agreement, which is connected to the indenture.  The strict foreclosure in question was given "the consent of the holder" by the collateral trust agreement.

As noted, multiple agreements of common execution and subject should be treated as a single writing and read together (*see Nau*, 286 NY at 197; *TVT Records*, 412 F3d at 89).  The collateral trust agreement, which was executed contemporaneously with the indenture, names U.S. Bank the collateral trustee and empowers U.S. Bank, acting in that capacity and upon a default, to foreclose upon the direction of the majority shareholders. Section 3.3 of the collateral trust agreement empowers U.S. Bank to act as directed by the majority of noteholders "in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral" following a default. Section 3.5 of the collateral trust agreement adds a grant of absolute authority to the collateral trustee to pursue a foreclosure authorized by the majority noteholders; through that section, individual noteholders forfeited the "right individually to realize upon any of

the Collateral" and acknowledged "that all powers, rights and remedies . . . may be exercised solely by the Collateral Trustee."[2]

The foreclosure provision contained in section 3.3 of the collateral trust agreement satisfies the consent requirement of section 6.07 of the indenture.  There is no need for *unanimity* of noteholder opinion; instead, trustee action is based on *majority* noteholder consent.  Absent an unanimity requirement, and in view of the forfeiture language of section 3.5 of the collateral trust agreement, there can be no conclusion other than the noteholders recognized that foreclosure could have occurred based on a majority vote of the noteholders.

The foreclosure and forfeiture provisions of the collateral trust agreement provide the consent for foreclosure required by the indenture when those documents are properly read as one (*see generally Nau*, 286 NY at 197).  Section 6.07 of that agreement makes consent a condition to foreclosure, and the seniority language of that section—namely, the "[n]otwithstanding" preposition—applies only to the text of the indenture.[3]  Left open in

---

[2]  This point is important.  The majority acknowledges that the trustee was authorized to pursue the strict foreclosure (*see* majority op at 13) but concomitantly reads the indenture in isolation to conclude that the strict foreclosure did not extinguish the ability of the minority noteholders to seek remuneration relative to the notes through a mechanism other than the strict foreclosure (*see* majority op at 19).  The application of that narrow lens to the contractual language that governs our review yields the flaw in the majority's analysis: it fails to see the import of the collateral trust agreement, which is to be read in conjunction with the indenture and by operation of which minority noteholders forfeited the right to recover on the notes through means of their own choosing.

[3] As noted, this part of the indenture provides that,

> "[n]otwithstanding any other provision of [the] *[i]ndenture*,
> the right of any [h]older to receive payment of principal of,

the indenture was the possibility that a codicillary agreement—such as the collateral trust agreement—would modify the indenture. That, of course, is precisely what occurred here, and the adjustment of the indenture by operation of the collateral trust agreement provided the consent of the minority noteholders required in the indenture to allow the majority noteholders to authorize the foreclosure in question here.

III.

A.

The majority, of course, reaches a different result, driven by its conclusion that the indenture and the collateral trust agreement are not of collective design and operate independently of one another (*see* majority op at 19-20). We see no reason to base our determination with respect to the propriety of the strict foreclosure upon only the indenture.

*Beal Sav. Bank v Sommer* (8 NY3d 318 [2007]) is instructive. There, in a dispute with respect to a syndicated loan arrangement, we read multiple documents evidencing the

---

premium, if any, and interest and [a]dditional [i]nterest, if any, on a [n]ote, on or after the respective due dates expressed in such [n]ote, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such [h]older" (emphasis added).

That is, section 6.07 of the indenture is "senior" and controlling, but only with respect to other parts of the *indenture*. Nothing in the indenture prohibits or precludes what happened here, namely, the superseding of part of the indenture by an ancillary compact. If it had been the intent that 6.07 of the indenture supersede any provision of any codicillary agreement, such as the collateral trust agreement, then the indenture easily could have (and surely would have) stated as much.

loan in question (*see id.* at 321-322) together, as if they comprised a single, unified compact (*see id.* at 326 [noting "that the agreements ha(d) an unequivocal collective design"]).

Here, the indenture repeatedly referred to the collateral trust agreement and placed those agreements under the single, unified umbrella of the "indenture documents."[4] Moreover, the collateral trust agreement is referred to in no fewer than eight sections of the indenture—notably, in the part of the indenture considering control by the majority in the event of default (section 6.05 of the indenture).  Those entangling references speak to a singular governance structure in which the notes and the obligations flowing therefrom are controlled by, among other things, an indenture and a collateral trust agreement that are to be read in tandem.

## B.

Although the indenture is not governed by the TIA, the majority emphasizes that act in support of its conclusion that the indenture documents, when read to isolate section 6.07 of the indenture and to shun section 3.3 of the collateral trust agreement, prohibit the strict foreclosure at issue here (*see* majority op at 11-14).  We disagree with that approach.

There can be no dispute that sections 6.05 and 6.07 of the indenture incorporate the language of TIA sections 316 (a) and (b), which are codified, respectively, at 15 USC §

---

[4]  To the extent it is relevant here, we note that the indenture documents consist of a third compact, characterized as the security agreement.  Similar to the collateral trust agreement, the security agreement endows the trustee with the remedial power to, among other things, exercise in respect of the collateral all rights and remedies of a secured party on a default under the UCC.  The majority notes that such power is rooted in the indenture (*see* majority op at 20 n 9), and in doing so clings to its misguided belief that the indenture is unaffected by the collateral trust agreement.

77ppp (a) (1) and § 77ppp (b).  Like the indenture, TIA section 316 (a) provides that a majority of holders may "direct the time, method, and place of conducting any proceeding for any remedy available to such trustee, or exercising any trust or power conferred upon such trustee, under [a qualified] indenture" (§ 77ppp [a] [1]; *cf.* indenture § 6.05).  Further similar to the indenture, TIA section 316 (b) adds that, "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder . . . to receive payment of the principal of and interest on [the] indenture security . . . shall not be impaired or affected without the consent of such holder" (§ 77ppp [b]; *see* indenture § 6.07).

The fact remains, however, that TIA sections 316 (a) and (b) apply only to "qualified" indentures, that is, indentures that cover securities that have been registered with the Securities and Exchange Commission (*see* 15 USC § 77iii [a]).  These notes were not so registered, meaning that the indenture was not qualified, and that the TIA does not have charge of this review.

## C.

Section 316 (b) of the TIA was complied with by the consent given by the noteholders through the collateral trust agreement.  However, even if the TIA and authorities interpreting that act controlled here, the result would be the same.  Made more artfully in the indenture than in the TIA is the point that the right of any holder, including a minority noteholder, shall not be diminished without the consent of that holder (*cf.* indenture § 6.07 with 15 USC § 77ppp [b]).  As stated, that was given.

The Second Circuit addressed a similar problem in *Marblegate Asset Mgt., LLC v Education Mgt. Fin. Corp.* (846 F3d 1 [2d Cir 2017]).  There, the Education Management

Corporation (EDMC) had outstanding secured and unsecured debt. The unsecured debt was issued by EDMC's subsidiaries, known collectively as the EDM Issuer, and governed by an indenture qualified under the TIA. The plaintiffs held unsecured notes with a face value of $14 million (*see id.* at 3).

As EDMC's financial position deteriorated, all EDMC creditors, except for the plaintiffs, consented to an intercompany sale. Under that sale, consenting secured creditors would foreclose on EDMC's assets pursuant to UCC article 9[5] and a 2014 credit agreement. Following a release, the collateral agent would sell the foreclosed assets to a new EDMC subsidiary constituted specifically for the intercompany sale. The new EDMC subsidiary would then distribute debt and equity to consenting creditors and continue the business. Non-consenting unsecured creditors (the plaintiffs) "would not receive anything from the new company: though not a single term of the Indenture was altered and [the unsecured creditors] therefore retained a contractual right to collect payments due under the Notes, the foreclosure would transform the EDM Issuer into an empty shell" (*id.* at 4).

Important for these purposes is the point that when the plaintiffs sued to enjoin the intercompany sale on the ground that it violated TIA section 316 (a) (codified, as noted, in 15 USC § 77ppp [b]), a divided Second Circuit refused to prohibit the sale because the "[t]he transaction did not amend any terms of [that] Indenture" (*Marblegate*, 846 F3d at 17). That is, where the sale in question was consistent with, and authorized by the indenture there in question, that transfer could not have been nullified for failure to comply with the

---

[5] The strict foreclosure remedy is codified in UCC 9-620 and UCC 9-622, which appear in UCC article 9.

consent requirement of TIA section 316 (b).  "Absent changes to the Indenture's core payment terms, [the minority noteholder could not] invoke section 316(b) to retain an 'absolute and unconditional' right to payment of its notes" (*Marblegate*, 846 F3d at 17). [6]

*Marblegate* prohibited only "formal indenture amendments to core payment rights" (846 F3d at 16).  The noteholders have a right to bring an action unless they consent to a change in that right.  The result here is consistent with *Marblegate* (846 F3d 1).  Similar to that case, the disaffected noteholders in this matter consented to the procedure now in question (here, the strict foreclosure) through the unmodified indenture documents, which, with minority  consent, confer upon the trustee the power to pursue the strict foreclosure with the authorization of the majority noteholders.[7]

IV.

---

[6]  As noted (*see supra* at 12), TIA section 316 (b) provides that, "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder . . . to receive payment of the principal of and interest on [the] indenture security . . . shall not be impaired or affected without the consent of such holder" (15 USC § 77ppp [b]).

[7] Some historical perspective is important in understanding the role of the TIA and the protections offered dissenting bondholders.  Any review makes clear that pre-TIA or post-TIA/pre-*Marblegate* dissenting bondholders were not entitled to a 100% payout, based on the controlling indenture, during reorganization.

The recoveries sought were not based on breach of contract, but on fraudulent conveyance and the facts of the case.  The TIA did not derive from any desire to suggest that a foreclosure-based reorganization meant that a bondholder's right to receive payment was automatically violated.

The argument supporting this reading of the history is thoughtfully set out in *Debt Restructurings and the Trust Indenture Act* by Harald Halbhuber (25 Am Bankr Inst l Rev 1 [2017]).

The conclusion that the indenture and the collateral trust agreement support the strict foreclosure course chosen by the trustee necessarily is accompanied by these additional comments.

The root problem in this case concerns not the TIA, but the question of the "cash out" on the notes. Read together, the indenture and the collateral trust agreement require a collective approach of the noteholders to restructuring upon default. That collective approach is driven by the majority of the noteholders, who upon default, exchanged their notes for the collateral securing those instruments. That collateral was stock in Cleveland Unlimited.

The indenture documents ensure that, in the event of a default, the "tail" that is the minority noteholders do not wag the "dog" that is the entire body of noteholders. There is no indication that the minority noteholders were anything other than open-eyed investors who voluntarily stepped into an arrangement in which their ability to control remuneration in the event of a default was sacrificed in the hopes of achieving financial reward.

Indeed, the reality is that this case requires determination of no more than contractual language that governs the relationship of majority and minority noteholders. The indenture documents authorize the foreclosure course taken by the trustee upon Cleveland Unlimited's default, and the conclusion to the contrary oddly implements the TIA in what should be this straightforward contractual analysis.

In fact, even the majority's implementation of the TIA is flawed. In short, the majority is incorrect to conclude that the TIA frowns on a direction to the trustee by 97% of the holders to effectuate a strict foreclosure. The SEC's concern was, for qualified

indentures, to make sure that the threshold for the percentage of bondholders necessary to

direct the action of the trustee not be set *too high*:

> "Under the Barkley bill, the trustee must exercise due care after default, whither the bondholders demand action or not. But suppose a certain percentage of the bondholders want to compel the trustee to follow some specific course of action. Anticipating just a little bit, let me say that the Commission would have the discretion and power, as I see it, to insist that the percentage required for that not be too high. That is, it would have the power to say, 'No.' Let us take a clear-cut case: An indenture provides that the trustee is not under responsibility to take the action specified unless 100 percent of the bondholders should make a request of it. I cannot imagine the Commission allowing a thing like that to go through" (*The Regulation of the Sale of Certain Securities in Interstate and Foreign Commerce, and the Trust Indentures Under Which the Same are Issued, and for Other Purposes*: *Hearing on S. 2344 Before a Subcommittee of the Committee on Banking and Currency*, 75th Cong. 48 [1937] [statement of William O. Douglas, Commissioner, Securities and Exchange Commission]).

As to qualified indentures, the TIA's principal innovation was not Section 316(b),

but rather the transformation of duty-less, immunized trustees to true fiduciaries, liable to

aggrieved bondholders for breaches of that duty. As Commissioner Douglas explained:

> "[I]n case of default under these corporate trust indentures, the trustee must move. He is in the danger zone there, and immediate action has to be taken. Investments are at stake which are about to be lost; the senior interest are about to wipe out the interests of the junior interests. There is about to be a reorganization, and the securityholders need an active agent in there. The main impact of the bill–not the exclusive, but the main impact, is upon the trustee, after default. The bill makes it exercise such rights and powers invested in it, and to use a degree of skill comparable with which a prudent man would exercise under the circumstances, if he were a fiduciary and had the skill which the trustee has or which the indenture trustee represents itself as having, as indenture trustee, at the

time of the offering of the indenture securities, whichever is the higher" (*The Regulation of the Sale of Certain Securities in Interstate and Foreign Commerce, and the Trust Indentures Under Which the Same are Issued, and for Other Purposes: Hearing on S. 2344 Before a Subcommittee of the Committee on Banking and Currency*, 75th Cong. 66-67 [1937] [statement of William O. Douglas, Commissioner, Securities and Exchange Commission]).

Contrary to the majority's conclusion, even as to qualified indentures, Section 316(b) of the TIA could not plausibly be read to disable a trustee, post default, from taking action that might in some sense "impair" the rights of bondholders to obtain a full recovery on their notes.  (At the point of default, the issuer has stated its inability to provide full payment.)  For an undisclosed reason, plaintiffs here chose not to sue the trustee for breach of its duties. Under the agreements here, properly read together, the trustee had the power to effectuate the strict foreclosure.  If that foreclosure was in breach of plaintiffs' rights, then they have a remedy.

At bottom, the majority's approach—in which it effectively ignores the collateral trust agreement, mistakenly applies the TIA to what should be a pure, direct contractual analysis, and then is mistaken in its application of the TIA within that review— needlessly injects uncertainty into a multi-trillion-dollar corporate debt market (*see Capital Markets Fact Book, 2019*, available at https://sifma.org/recourse/research/fact-book/ [last accessed Sept. 29, 2020]).  It ultimately strikes a chord of disharmony in undermining what should be the prevailing rule in both this Court and the Second Circuit that agreements of collective design should be read as one.  It also compels this dissent.

For all of the foregoing reasons, we would affirm the Appellate Division order.

Order modified, without costs, by denying defendants' motion for summary judgment and granting partial summary judgment to plaintiffs in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Stein and Feinman concur. Judge Fahey dissents and votes to affirm in an opinion in which Judges Rivera and Wilson concur.

Decided October 22, 2020